# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

U.C SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/28/19

655 Fifteenth Street, N.W.
Washington, D.C. 20005
United States

Judson Brown, P.C.
To Call Writer Directly:
+1 202 879 5082
jdbrown@kirkland.com

+1 202 879 5000

Facsimile:
+1 202 879 5200

www.kirkland.com

January 25, 2019

**Via Hand Delivery**

United States District Judge Victor Marrero
Suite 1040
United States Courthouse
500 Pearl Street
New York, New York  10007

Re:  *Compass Prods. Int'l LLC v. Charter Commcn's, Inc.*, No. 1:18-cv-12296 (S.D.N.Y.)

Dear Judge Marrero:

I write on behalf of Defendant Charter Communications, Inc. to notify the Court that the parties have concluded the informal procedure your individual practices require before a defendant may file a motion to dismiss. The parties' exchange of letters (attached as Ex. 1 and Ex. 2) did not resolve our dispute over the merits of such a motion. Plaintiff Compass Productions International, LLC did not propose any amendment to the complaint, much less one that would cure the multiple deficiencies with its claims—nor could it. Charter believes a motion to dismiss is still warranted and submits this letter in accordance with § II.B.2 of this Court's individual practices.

The complaint makes the following allegations, which are assumed to be true for purposes of Charter's contemplated motion. Compass owns The Jewish Channel ("TJC"), which "provides Jewish programming catering toward the Jewish population within the United States." Compl. ¶ 17 [ECF 1-1]. Since 2007, TJC has been available through multiple cable companies as a Subscription Video On Demand ("SVOD") channel. *Id.* ¶¶ 22–23, 25. SVOD channels make their content available through menus where subscribers can select specific programs to watch. *Id.* ¶ 15. This distribution model differs from the linear programming model, which provides a constant stream of programming and is usually offered as a package to cable subscribers. *Id.* ¶¶ 7, 12–13.

For several years, Compass unsuccessfully tried to find a cable operator willing to carry TJC as a linear channel. *Id.* ¶¶ 35, 38. In 2015, Compass tried to use the FCC's review of Charter's proposed merger with Time Warner Cable to pressure Charter into carrying TJC as a linear bundled channel. *Id.* ¶¶ 23, 25, 40–41, 47, 58–59. Compass and Charter met in November 2015; Charter Senior Vice President of Programming, Allan Singer ("Singer") and Compass CEO Eliezer Singer ("Elliot") attended, among others. *Id.* ¶¶ 64, 65. During the meeting, Charter "did not provide any clear commitment for specific timing for a launch of TJC as a Linear Bundled channel." *Id.* ¶ 67.

During a later telephone conversation, Singer allegedly told Elliot that "if the [upcoming]

merger [with Time Warner] was approved," then "he *could* give TJC carriage" as a linear channel with a license fee of "one nickel per subscriber per month." *Id.* ¶¶ 80–82 (emphasis added). But Singer then made clear that "a formal contract would have to wait until after the merger's approval." *Id.* ¶ 84. When Elliot asked for a "standard contract form," he again "was told" by Singer "that that could not or would not be done until after the merger." *Id.* ¶ 85.

The next day, Elliot sent Singer a one-page "Programmer *Proposal* to Charter Communications," which stated "Detailed terms *to be defined in a contract* between Programmer and Charter Communications." Ex. 3 (emphasis added); Compl. ¶ 89.[1] Elliot stated that this proposal "reflects the points we touched on during our call." Ex. 3. Singer responded: "I believe you understand it does not actually reflect all the points we discussed, but thank you very much nonetheless." Ex. 4; Compl. ¶ 92. Elliot replied and expressed confusion about what points Singer had referenced, noting his assumption that any open terms "would be something you'd put in a contract rather than a rate card." Ex. 4. He asked "[i]f there's something else I've forgotten, please let me know what I've missed" and offered to "revise and resend." *Id.* Singer never responded, and Elliot never sent another proposal. Compl. ¶ 93. About a year later, Charter's new head of programming told Elliot "there was no promised deal" between Charter and Compass. *Id.* ¶ 108.

In February 2018, Charter contacted Compass about "a lack of new content" on TJC. *Id.* ¶ 118. Compass investigated and determined that "a technical error had caused much of TJC's programming to be erased off of Defendant CHARTER'S servers." *Id.* These "technical errors with files" had "occur[red] with some frequency" at Compass. *Id.* ¶ 119. The content was eventually restored, but then the same problem occurred again. *Id.* ¶ 121. As a result, Charter decided to terminate carriage of TJC. *Id.* Charter notified TJC subscribers that "[a]s of 6/22/2018, The Jewish Channel ceased providing full video content to [Charter]. This channel's content will no longer be available, effective on or around 9/25/2018." Ex. 5; Compl. ¶ 124.

Compass sued, alleging claims for breach of contract, promissory estoppel, and fraudulent inducement arising out of the discussions between Singer and Elliot and a claim for defamation relating to the postcard sent to TJC subscribers. Charter timely removed the case to this Court and now outlines why dismissal of the complaint is warranted.

**Breach of Contract.** This claim suffers from multiple, independent flaws. *First,* Compass's assertion that the parties' discussions resulted in a contract runs headlong into the statute of frauds because the alleged agreement cannot be performed within one year and there is no writing "signed" or "subscribed" by Charter. N.Y. Gen. Obl. Law § 5-701(a); Conn. Stat. § 52-550(a).[2] Compass alleges Charter agreed to "five years of ... distribution for TJC," Compl. ¶ 127, which clearly cannot be performed in one year and thus falls within the statute. *See Doynow v. Nynex Pub. Co.*, 608 N.Y.S.2d 683, 684 (N.Y. App. Div. 1994) ("[P]laintiff alleged that there was an oral contract of five years' duration, and thus his claim is barred by the Statute of Frauds.").

---

[1] The complaint references, relies on, and quotes the rate card, related emails, and a postcard sent to Charter customers. Compl. ¶¶ 87–93, 124. They are therefore incorporated into the complaint by reference and are attached to this letter as Exs. 3, 4, and 5. *See, e.g., Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

[2] The complaint alleges that Compass is located in New York, and Charter is headquartered in Connecticut. Compl. ¶¶ 1, 107. Application of New York or Connecticut law produces the same result, and the Court therefore "need not conduct a choice-of-law inquiry." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 171 (2d Cir. 2012).

The complaint identifies only one writing: the rate card "proposal" Elliot emailed to Singer. Compl. ¶ 89; Ex. 3. But that fails to satisfy the statute of frauds for multiple reasons.

- The rate card was unilaterally drafted by Compass, and it "is well established that unsigned writings prepared by the plaintiff without more" cannot as a matter of law satisfy the statue of frauds. *Bronner v. Park Place Entm't Corp.*, 137 F. Supp. 2d 306, 311 (S.D.N.Y. 2001).

- Charter never subscribed to that writing. Indeed, the complaint affirmatively alleges Charter *rejected* it when Singer told Elliot the rate card "does not actually reflect all the points we discussed." Ex. 4; Compl. ¶ 91. Singer's response "demonstrate[d] a distinct lack of agreement" between the parties and thus fails to satisfy the writing requirement of the statute of frauds. *Vioni v. Am. Capital Strategies Ltd.*, 2009 WL 174937, at *3 (S.D.N.Y. Jan. 23, 2009); *see also Dahan v. Weiss*, 991 N.Y.S.2d 119, 121 (N.Y. App. Div. 2014) (statute of frauds writing requirement not met by emails that showed "the material terms of the agreement were not settled"); *Bronner*, 137 F. Supp. 2d at 313 (similar).

- The rate card does not "on its face ... contain the essential terms of the agreement." *Miller v. Tawil* 165 F. Supp. 2d 487, 494 n.10 (S.D.N.Y. 2001). As Singer explained, it "does not actually reflect all the points we discussed." Ex. 4; Compl. ¶ 91.

Nothing in Compass's response letter avoids this straightforward application of the statute of frauds. Compass contends that claims based on contracts implicating the statute of frauds "should usually proceed to discovery." Ex. 2 at 2. That is wrong. "Consideration of the Statute of Frauds as an affirmative defense is appropriate on a motion to dismiss, as such a motion is intended to weed out meritless claims, avoiding needless efforts on the parts of the parties and the Court and avoiding needless discovery." *Zeising v. Kelly*, 152 F. Supp. 2d 335, 343 (S.D.N.Y. 2001). As a result, "[c]ourts routinely dismiss breach of contract claims on statute of frauds grounds." *Stillman v. Townsend*, 2006 WL 2067035, at *2 (S.D.N.Y. July 26, 2006) (citing cases).

Compass also tries to recharacterize its claim, arguing that the contract comprised Compass's agreement to "cease[] its efforts at communicating with the FCC" on the one hand, and Charter's agreement to "*provide* Plaintiff with a carriage deal containing specific essential terms" on the other hand. Thus, Compass's argument goes, "performance by both parties"—Compass ceasing lobbying and Charter entering a five-year carriage deal—"was feasible, and contemplated, within one year." Ex. 2 at 1 (emphasis added). But *any* plaintiff could recast its contract claim as an agreement by the defendant to *enter* a written agreement when the contemplated agreement would last more than a year. That is simply not how the statute of frauds works. An "agreement to agree" that would necessarily impose obligations beyond one year is governed—and prohibited—by the statute of frauds. *See, e.g., Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 363 (S.D.N.Y. 2018). Here, the complaint specifically alleges that the agreement involved a five-year term of carriage, which "obviously could not be performed within one year." *Stillman*, 2006 WL 2067035, at *4.

Next, Compass says the statute of frauds does not apply because Singer never responded after Elliot offered to "revise and resend" his proposal, apparently arguing that Singer's silence constitutes assent to the rate card's terms. Ex. 2 at 1. As a matter of law, however, silence in the face of a proposal is not assent sufficient to satisfy the statute of frauds. *See, e.g., Bronner*, 137

F. Supp. 2d at 312 ("The Statute of Frauds would serve no purpose if [defendant's] silence could elevate [plaintiff's] letter to a writing sufficient to satisfy its requirements."). Compass's citation to N.Y. Gen. Oblig. Law § 5-701(b)(3)(a), (b), (d), Ex. 2 at 1–2, is unavailing because these provisions apply only to a "qualified financial contract," which is an agreement to purchase or sell currency, commodities, options, or debt. Similarly, Compass gets no mileage out of *Club Chain of Manhattan, Ltd. v. Christopher & Seventh Gourmet*, Ltd., 427 N.Y.S.2d 627 (N.Y. App. Div. 1980). There, the court equitably excused the plaintiff tenant from application of the statute of frauds on the basis of partial performance. *Id.* at 281–82. But it "is well settled that part performance by one party does not take a contract that cannot be performed within one year of its making out of the statute of frauds—unless the contract is one relating to a transaction in real estate, which is not the case here." *Gentile v. Conley*, 636 F. Supp. 2d 246, 255 (S.D.N.Y. 2009); *see also, e.g., Human Techs. Corp. v. Tenn. Ala. Mfg., Inc.*, 46 N.Y.S.3d 745, 746 (N.Y. App. Div. 2017); N.Y. Gen. Oblig. Law § 5-703(4).

*Second*, the breach of contract claim independently fails because the complaint does not show an agreement between the parties. No contract can exist without "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Saul v. Cahan*, 61 N.Y.S.3d 265, 269 (N.Y. App. Div. 2017). By the allegations of the complaint, this never occurred. During the phone call, Elliot and Singer never discussed— let alone agreed upon—the duration of the contract, the specific timing for a launch, or other material terms of a multi-year carriage agreement. Compl. ¶¶ 80–86. Indeed, Singer made clear to Elliot that any discussion of the "timing for a launch" was an "impossibility" in light of an upcoming merger. *Id.* ¶ 86. And two days later Singer expressly rejected Elliot's proposed rate card, which offered a five-year contract. *Id.* ¶ 91; Ex. 4.

Compass asserts that Elliot's proposed rate card shows "the essential terms were reached and agreed to." Ex. 2 at 1. But the rate card was not a "memorializ[ation]" of an "agreed-upon deal." *Id.* By its very terms, the rate card was a "proposal" for an "agreement." Ex. 3. It is black-letter contract law that a "proposal" is "[s]omething offered for consideration or acceptance." Black's Law Dictionary (10th ed. 2014). And unless an offer is "followed by an acceptance by the other party," no contract is formed. Restatement (Second) of Contracts § 22; *see also, e.g.*, 2 Williston on Contracts § 6:10 (4th ed.) ("As a general principle, at common law an acceptance, in order to be effective, must be positive and unambiguous."). Singer responded to Elliot's proposal by stating that "it does not actually reflect all the points we discussed." Ex. 4. And then Singer ignored Elliot altogether. Compl. ¶ 93. Singer's response to the "proposal" does not reflect "acceptance" that was "clear, unambiguous and unequivocal," as required to show the formation of a valid contract. *Pinto-Thomaz v. Cusi*, 2015 WL 7571833, at *9 (S.D.N.Y. Nov. 24, 2015).

Compass also claims that, at the motion to dismiss stage, it is "inappropriate to consider" an argument that the parties did not agree on all material terms. Ex. 2 at 2. But courts routinely dismiss complaints for failure to allege facts showing the parties agreed on all material terms. *See, e.g., Anders v. Verizon Commc'ns Inc.*, 2018 WL 2727883, at *9 (S.D.N.Y. June 5, 2018) (dismissing breach of contract claim where allegations failed to show agreement on "how long" the contract would last); *Jinno Int'l Co. v. Premier Fabrics, Inc.*, 2013 WL 4780049, at *3 (S.D.N.Y. May 24, 2013) (similar); *Hudson & Broad, Inc. v. J.C. Penney Corp.*, 553 F. App'x 37, 39 (2d Cir. 2014) (similar); *Wald v. Graev*, 27 N.Y.S.3d 535, 537 (N.Y. App. Div. 2016) (similar).

4

Moreover, an oral contract cannot be formed "[w]hen a party gives forthright, reasonable signals that it means to be bound only by a written agreement." *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, 2003 WL 23018888, at *4 (S.D.N.Y. Dec. 22, 2003); *accord Pinto-Thomaz*, 2015 WL 7571833, at *10 (dismissing claim "[b]ecause Cusi's attorney expressly stated that no agreement would be reached until the terms had been memorialized in an executed contract"). Singer gave precisely those signals when he twice told Elliot that he was not willing to do "a formal contract" at that juncture. Compl. ¶ 84. Citing *Consarc Corp. v. Marine Midland Bank*, N.A., 996 F.2d 568 (2d Cir. 1993), Compass asserts that that an agreement may be enforceable even if the parties intend to memorialize it later. Ex. 2 at 1. But *Consarc* did not involve a situation where the party to be bound had repeatedly insisted that a written agreement was necessary. 996 F.2d at 577. And as *Consarc* emphasizes, the parties need to "have settled on the contract's substantial terms." *Id.* at 574. By the allegations of the complaint, Elliot and Singer never agreed on substantial terms, including the duration of the contract or the launch date.

*Third*, the complaint fails to allege that Compass—the plaintiff here—was in privity of contract with Charter. The alleged discussions, and the proposal itself, related only to TJC, not Compass. *See, e.g.*, Compl. ¶¶ 67, 74.

**Promissory Estoppel.** Compass's quasi-contract claim for promissory estoppel fares no better. *First*, the allegations do not show that Charter made a "clear and unambiguous" promise upon which Compass "reasonabl[y] and foreseeabl[y]" relied. *See Marvin Inc. v. Albstein*, 386 F. Supp. 2d 247, 253 (S.D.N.Y. 2005). Courts routinely dismiss tag-along claims for promissory estoppel when the allegations fail to show definite promises and reasonable reliance. *See, e.g., id.*; *DDCLAB Ltd. v. E.I. DuPont De Nemours & Co.*, 2005 WL 425495, at *6 (S.D.N.Y. Feb. 18, 2005); *Banco Espirito*, 2003 WL 23018888, at *6–*7; *N.Y. Military Acad. v. NewOpen Grp.*, 36 N.Y.S.3d 199, 201 (N.Y. App. Div. 2016); *Washington v. Kellwood Co.*, 2009 WL 855652, at *9-*10 (S.D.N.Y. Mar. 24, 2009).

Compass's attempt to cherry-pick statements from Singer and Elliot's telephone discussion about the framework for a potential contract do not save the claim. During the call, Singer's statements were—at most—unclear and ambiguous: "if the merger was approved" then Charter "could give TJC carriage" but "a formal contract would have to wait" and "could not or would not be done until after the merger." Compl. ¶¶ 80, 84–85. And after the call, Singer rejected Elliot's proposed rate card and then ignored Elliot altogether. *Id.* ¶¶ 91–93; Ex. 4. Courts regularly reject attempts to lift statements from negotiations about a potential contract to support a clam for promissory estoppel, precisely because those statements in that context are unclear, indefinite, and ambiguous. *See, e.g., Wilson v. Dantas*, 746 F.3d 530, 538 (2d Cir. 2014) (affirming dismissal of promissory estoppel claim where "assurance" made during employment contract negotiation "was neither clear nor unambiguous"); *Marvin*, 386 F. Supp. 2d at 249, 254 (dismissing claim for promissory estoppel when plaintiff alleged that the defendant "orally agreed" to a contractual term); *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 361 (S.D.N.Y. 2017) (similar).

Nor does the complaint allege facts showing that Compass reasonably relied on anything said during the phone call. Elliot could not have considered anything Singer said to be a promise; otherwise, Elliot would not have sent him a rate card "propos[ing]" terms. Ex. 3. And any reliance would be per se unreasonable after Singer responded to Elliot's proposal the very next day, stating

that the proposal did not capture Charter's position. Ex. 4; Compl. ¶ 91. As a longtime and sophisticated player in the industry, Compl. ¶¶ 52–59, Compass understood that a complex, multi-year agreement for carriage could not be resolved with a single phone call, and it would have been unreasonable for Compass to assume so. *See, e.g., Banco Espirito*, 2003 WL 23018888, at *7.

*Second*, Compass fails to allege facts showing an unconscionable injury or serious injustice. *See, e.g., United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001); *D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High Sch.*, 520 A.2d 217, 221 (Conn. 1987). "[T]o invoke the doctrine of promissory estoppel to circumvent the Statute of Frauds, Plaintiff must demonstrate 'unconscionable' injury, i.e., injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement." *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008). A "lost opportunity" to lobby the FCC is not the sort of "egregious circumstance[]" that is unconscionable, *id.*, especially where this theory of injury piles speculation upon speculation—that if Charter had not engaged in discussions with Compass, Compass would have then lobbied the FCC, that the FCC would have then pressured Charter to carry Compass, and that Charter would have done so. There are no allegations to render this chain of events remotely plausible. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

According to Compass, whether an "unconscionable" injury occurred is a question ill-suited for a motion to dismiss. Ex. 2 at 2. But in a mine run commercial case like this, courts routinely dismiss promissory estoppel claims that fail to allege damages beyond the non-performance of an unenforceable agreement. *See, e.g., United Magazine*, 146 F. Supp. 2d at 405, *Darby Trading Inc.*, 568 F. Supp. 2d at 341, *Stillman*, 2006 WL 2067035, at *5; *Sea Trade Co. v. FleetBoston Fin. Corp.*, 2004 WL 2029399, at *6 (S.D.N.Y. Sept. 9, 2004); *N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, 2000 WL 1290608, at *3 (S.D.N.Y. Sept. 12, 2000).

**Fraud.** Compass recycles the exact same allegations for its fraud claim that it does for its contract claims, relying on the telephonic discussions between Elliot and Singer in December 2015. Compl. ¶¶ 127, 147, 156–58. Charter disputes Compass's allegations, but even if they were true, it is well established that "false statements indicating an intent to perform under a contract are insufficient to support a claim of fraud." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 491 (S.D.N.Y. 2017); *see also, e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). That is because "a plaintiff cannot, with a naked assertion that Defendants had no intention of complying with the terms of the agreement with plaintiffs, shoehorn a claim of fraud into a basic breach of contract dispute." *Maricultura Del Norte v. World Bus. Capital, Inc.*, 159 F. Supp. 3d 368, 378 (S.D.N.Y. 2015).

Compass asserts that "where promissory statements are made with a preconceived and undisclosed intention to not perform" they may support a fraud claim independent of a breach of contract claim. Ex. 2 at 3 (citing *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003 (N.Y. 1986)). But as New York courts have explained, under this principle from *Deerfield*, "a false promise is actionable as fraud only if the promised performance is *outside* the terms of any contract between the parties." *Cronos Grp. Ltd. v. XComIP, LLC*, 64 N.Y.S.3d 180, 191 (N.Y. App. Div. 2017) (emphasis added). Here the alleged promises underlying the breach of contract claim and the fraud claim are identical—that Charter would provide TJC with carriage.

Compass also claims that its fraud claim is viable because it "seeks damages different than those contained within the contract cause of action." Ex. 2 at 3. But to state an independent fraud claim a plaintiff must allege *special damages*, which "compensate a plaintiff for losses other than the value of the promised performance that are incurred as a result of the defendant's breach" and which "must be [pled] with particularity." *Bibeault v. Advanced Health Corp.*, 2002 WL 24305, at *6 (S.D.N.Y. Jan. 8, 2002). Here the only additional "damages" are punitive damages, which do not "differentiate the damages recoverable for fraud from those sought for breach of contract," *Russell Pub. Grp., Ltd. v. Brown Printing Co.*, 2014 WL 1329144, at *3 (S.D.N.Y. Apr. 3, 2014), and attorneys' fees, which are not damages. Ex. 2 at 3.

The fraudulent inducement claim also fails on its own terms, a point that Compass fails to address in its response letter. *First*, Compass has not shown a false statement. As discussed above, the allegations show the absence of any final or defined agreement on carriage between Elliot and Singer. Compass was told that "there was no promised deal." Compl. ¶ 108.

*Second*, Compass has not alleged facts "that give rise to a strong inference of fraudulent intent." *U.S. Capital Partners, LLC v. Stanwich Capital Advisors, LLC*, 2015 WL 4388421, at *3 (S.D.N.Y. July 17, 2015). Compass's allegations of intent are insufficient as a matter of law because they are based solely on conclusory allegations made "[u]pon information and belief," Compl. ¶¶ 159–60, and lack any additional facts rendering that "belief" plausible. The obvious alternative explanation is that Charter, like every other cable operator, did not see a business need to carry TJC as part of its linear bundle. *Id.* ¶ 38.

*Third*, Compass cannot show justifiable reliance for the reasons discussed above.

*Fourth*, Compass has not asserted compensable damages. Neither New York nor Connecticut allows for recovery of speculative profits resulting from an alleged fraud. *See Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1374 (N.Y. 1996); *Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011, 1018 (D. Conn. 1994). Compass alleges that it "lost out on its unique opportunity to lobby the FCC to condition approval of the merger on the distribution of a Linear TJC," and that Compass "did not engage in anything more than tentative discussions with any other cable provider," "los[ing] out on at least 15 months of revenue as a linear channel that could have been obtained in the interim from another cable provider." Compl. ¶¶ 163, 166, 167. These damages rely on a series of intervening events and ultimately a future "contractual bargain, the extent, and, indeed, . . . the very existence of which is completely undeterminable and speculative." *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1163 (N.Y. 2017); *accord Bank Hapoalim B.M. v. WestLB AG*, 995 N.Y.S.2d 7, 11 (N.Y. App. Div. 2014).

**Defamation.** Compass's unrelated claim for defamation—based on a postcard informing Charter subscribers that "[a]s of 6/22/2018, The Jewish Channel ceased providing full video content to Spectrum," Ex. 5; Compl. ¶ 124—also fails. *First*, Compass has not pleaded facts establishing "a false statement," an essential element of any defamation claim. *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 245 (2d Cir. 2017). Far from being a "blatant untruth," Compl. ¶ 124, the complaint supplies ample support for the postcard statement. The complaint admits that "a technical error ... caused ... much of TJC's programming to be erased off of Defendant CHARTER'S servers," *id.* ¶ 118, and that the same thing happened again "[s]hortly thereafter," *id.* ¶ 121. Charter then decided to terminate TJC. *Id.* In other words, Compass "ceased

providing full video content" to Charter so "content w[ould] no longer be available," which is exactly what Charter told its customers. Ex. 5; Compl. ¶ 124.

Compass's letter does not dispute any of this. The letter notes only that the complaint "specifically alleges that all of the content had been replaced." Ex. 2 at 3; Compl. ¶ 121. But the fact that the content was restored does not make Charter's statement that Compass "ceased providing full video content" false; it only confirms that the content had been missing.

*Second*, Compass fails to plead facts showing either special damages or libel per se, as is required to plead a defamation claim. *See, e.g., Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010). Compass asserts that it has pleaded special damages in the form of "subscribers who have ceased to exist." Ex. 2 at 3. It is unclear what this means. The "subscribers" referred to in the portion of the complaint cited by Compass are those who had subscribed to TJC as a VOD channel through Charter. Compl. ¶ 124. Those subscribers "ceased to exist" because Charter stopped providing TJC to its customers, not because of any statement by Charter. In addition, special damages "must be fully and accurately stated, with sufficient particularity to identify actual losses," and "courts will dismiss defamation claims for failure to allege special damages with the requisite degree of specificity." *Thai*, 726 F. Supp. 2d at 330. "To assert special damages based on lost sales, a plaintiff must both name the individuals who ceased to be customers, or who refused to purchase, and itemize the exact damages." *Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 641 (2d Cir. 2015). Compass has not come close to doing so.

Nor has Compass made allegations showing libel per se. A defamatory statement is libelous per se if it "imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties." *Jacobus v. Trump*, 51 N.Y.S.3d 330, 340 (N.Y. Sup. Ct. 2017). In its letter, Compass states "the Complaint alleges defamation *per se* since Defendant's false statement was meant to injure my client in its trade or business." Ex. 2 at 3. But the only harm Compass identifies is that "Defendant's untrue statement implied and conveyed falsely that Plaintiff was shutting down and no longer providing content." Compl. ¶ 177. However, nothing in the statement from Charter reasonably implies that TJC—or more critically, Compass—was shutting down altogether.

Even then, the statement would be at most a comment on the profitability of a single television station and not Compass's "entire business existence." *Kforce, Inc. v. Alden Pers., Inc.*, 288 F. Supp. 2d 513, 517 (S.D.N.Y. 2003). Merely saying that part of a business is closing is not libel per se because it does not say anything about the character of the overall business. *See, e.g., id.* (collecting cases). Compass's letter acknowledges this principle, but then asserts, without explanation, that the postcard "impugn[ed]" Compass's "entire business." Ex. 2 at 3. But nothing in the postcard says anything about Compass at all, and a defamation claim cannot be based on "a party's summary or characterization of that communication." *Verragio, Ltd. v. AE Jewelers, Inc.*, 2017 WL 4125368, at *7 (S.D.N.Y. Aug. 23, 2017).

*Third*, Compass has not shown that the postcard statement was "of and concerning" Compass. *Bilinski*, 632 F. App'x at 639. Here, the allegedly defamatory statement refers solely to TJC and makes no mention of Compass, which is another independent reason for dismissal.

8

Sincerely,

Judson Brown, P.C.

Enclosures

1.      01/04/2019 Letter from Charter to Compass

2.      01/11/2019 Letter from Compass to Charter

3.      12/22/2015 TJC Proposal

4.      12/24/2015 Email chain between Elliot Singer and Allan Singer

5.      08/15/2018 Spectrum Postcard

cc:     Via FedEx, and Email

        Mr. Jonathan E. Neuman, Esq.
        176-25 Union Turnpike, Suite 230
        Fresh Meadows, New York 11366

The Clerk of Court is directed to enter into the public record
of this action the letter above submitted to the Court by
*defendant Charter Communications, Inc.*

SO ORDERED.

_1-28-19_____     _____
DATE                 VICTOR MARRERO, U.S.D.J.

# EXHIBIT 1

# KIRKLAND & ELLIS LLP

**AND AFFILIATED PARTNERSHIPS**

655 Fifteenth Street, N.W.
Washington, D.C. 20005
United States

Judson Brown, P.C.
To Call Writer Directly:
+1 202 879 5082
jdbrown@kirkland.com

+1 202 879 5000

Facsimile:
+1 202 879 5200

www.kirkland.com

January 4, 2019

**Via Hand Delivery, FedEx, and Email**

Mr. Jonathan E. Neuman, Esq.
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366

Re:   Compass Prods. Int'l LLC v. Charter Commcn's, Inc., No. 1:18-cv-12296 (S.D.N.Y.)

Dear Mr. Neuman:

On January 2, 2019, this removed case was assigned to Judge Victor Marrero, two days before Charter's deadline to respond to the complaint. *See* Fed. R. Civ. P. 81(c)(2)(C). As per section II.B of Judge Marrero's individual practices, I write to tell you that Charter intends to move to dismiss the complaint in its entirety under Rule 12(b)(6), but will not file a formal motion until completion of Judge Marrero's required procedures. For the reasons set forth below, the complaint should be dismissed and Charter does not believe any amendment would cure the deficiencies.

**Breach of Contract.** Plaintiff's breach of contract claim suffers from multiple flaws. *First*, the statute of frauds squarely bars this claim. An agreement that cannot be performed within one year is void unless set forth in a writing that is "signed" or "subscribed" by Charter. N.Y. Gen. Oblig. Law § 5-701(a); Conn. Stat. § 52-550(a).[1] The complaint alleges that Charter agreed to a contract for "five years of ... distribution for TJC." Compl. ¶ 127. But the only writing the complaint identifies is a rate card that Compass's CEO Elliot Singer ("Elliot") emailed to Charter Senior Vice President of Programming Allan Singer ("Singer") after a telephone conversation. *Id.* ¶ 89. The one-page rate card is titled "Programmer *Proposal* to Charter Communications," and states that "Detailed terms" were "*to be defined in a contract* between Programmer and Charter Communications." Ex. A (emphasis added).[2] As the complaint alleges, Singer responded by stating that the rate card "does not actually reflect all the points we discussed, but thank you very much nonetheless." Ex. B; Compl. ¶ 91. Singer's response "demonstrate[d] a distinct lack of agreement" with Elliot's proposal, and as a result, the rate card cannot as a matter of law satisfy the writing requirement of the statue of frauds. *Vioni v. Am. Capital Strategies Ltd.*, 2009 WL 174937, at *3 (S.D.N.Y. Jan. 23, 2009); *see also, e.g., Dahan v. Weiss*, 991 N.Y.S.2d 119, 121

---

[1] The complaint alleges that Compass is located in New York, and Charter is headquartered in Connecticut. Compl. ¶¶ 1, 107. Application of New York or Connecticut law produces the same result, and the Court therefore "need not conduct a choice-of-law inquiry." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 171 (2d Cir. 2012).

[2] The complaint references, relies on, and quotes the rate card, related emails, and a postcard sent to customers by Charter. Compl. ¶¶ 87–93, 124. They are therefore incorporated into the complaint by reference and are attached to this letter. *See, e.g., Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

(N.Y. App. Div. 2014). Moreover, the rate card does not "on its face ... contain the essential terms of the agreement." *Miller v. Tawil* 165 F. Supp. 2d 487, 494 n.10 (S.D.N.Y. 2001).

*Second*, the complaint fails to allege contract formation. No contract can exist without "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Saul v. Cahan*, 61 N.Y.S.3d 265, 269 (N.Y. App. Div. 2017). By the allegations of the complaint, this never occurred. During the phone call, Elliot and Singer never discussed—let alone agreed upon—the duration of the contract. Compl. ¶¶ 80–86. Singer then made clear to Elliot that any discussion of the "timing for a launch" was an "impossibility" in light of an upcoming merger. *Id.* ¶ 86. And two days later Singer expressly rejected Elliot's proposed rate card. *Id.* ¶ 91; Ex. B. Moreover, an oral contract cannot be formed "[w]hen a party gives forthright, reasonable signals that it means to be bound only by a written agreement." *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, 2003 WL 23018888, at *4 (S.D.N.Y. Dec. 22, 2003); *see also, e.g., Pinto-Thomaz v. Cusi*, 2015 WL 7571833, at *10 (S.D.N.Y. Nov. 24, 2015). Singer gave precisely those signals to Elliot. Compl. ¶¶ 84–85.

*Third*, the complaint fails to allege that Compass was in privity of contract with Charter. The alleged discussions related only to TJC, not Compass. *See, e.g.,* Compl. ¶¶ 67, 74; Ex. A.

**Promissory Estoppel.** Plaintiff's promissory estoppel claim fares no better. *First*, the facts alleged do not show that Charter made a "clear and unambiguous" promise upon which Compass "reasonabl[y] and foreseeabl[y]" relied. *Marvin Inc. v. Albstein*, 386 F. Supp. 2d 247, 253 (S.D.N.Y. 2005). Before the call, Singer "did not provide any clear commitment," *id.* ¶ 67 and told Elliot that "COMPASS should wait for some follow-up from ... CHARTER," *id.* ¶ 68. During the call, Singer's statements were unclear and ambiguous: "if the merger was approved" then Charter "could give TJC carriage" but "a formal contract would have to wait" and "could not or would not be done until after the merger." *Id.* ¶¶ 80, 84–85. And after the call, Singer rejected Elliot's proposed rate card and then ignored Elliot altogether. *Id.* ¶¶ 92–93; Ex. B. These facts do not allege a clear and specific promise. *See, e.g., Wilson v. Dantas*, 746 F.3d 530, 538 (2d Cir. 2014); *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 361 (S.D.N.Y. 2017). Nor could Compass possibly have reasonably relied on anything said during the phone call—particularly when the rate card Elliot subsequently sent was merely a "proposal" that Singer rejected. *See, e.g., Banco Espirito*, 2003 WL 23018888, at *6.

*Second*, Compass fails to allege facts showing an unconscionable injury or serious injustice, which is necessary here. *See, e.g., United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001); *D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High Sch.*, 520 A.2d 217, 221 (Conn. 1987). A "lost opportunity" to lobby the FCC is not the sort of "egregious circumstance[]" that qualifies as unconscionable, *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008), especially where this theory of injury piles speculation upon speculation about what would have happened. At most, Compass alleges the sort of typical monetary injury resulting from loss of advertising revenue and potential viewers, which is not unconscionable.

**Fraudulent Inducement.** The fraudulent inducement claim likewise fails. *First*, Compass recycles the same allegations for its fraud claim that it does for its contract claims, adding only the conclusory, inconsistent allegation that Charter "had no intention of launching a Linear TJC" and "intended to defraud Plaintiff COMPASS with this fraud." Compl. ¶¶ 127, 147, 156–60. But "false statements indicating an intent to perform under a contract are insufficient to support a claim of fraud." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 491 (S.D.N.Y. 2017); *see also, e.g.,*

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). And it is not enough to "append[] allegations about [Charter]'s state of mind to the claim for breach of contract." *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996).

*Second*, Compass fails to plead with particularity that "(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result." *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 528 (S.D.N.Y. 2001).

- The only false statement alleged is that "CHARTER promised COMPASS that upon approval of the merger CHARTER would launch TJC as a Linear Bundled channel." Compl. ¶ 155. As discussed above, the allegations show the absence of any final or defined agreement on carriage, and Compass was explicitly told that "there was no promised deal." *Id.* ¶ 108.

- Compass has also not alleged facts "that give rise to a strong inference of fraudulent intent." *U.S. Capital Partners, LLC v. Stanwich Capital Advisors, LLC*, 2015 WL 4388421, at *3 (S.D.N.Y. July 17, 2015). The allegation of intent is based solely "[u]pon information and belief," Compl. ¶¶ 159–60, and lacks any support rendering that "belief" plausible, especially in light of the obvious explanation that Charter, like every other cable operator, did not see a business need to carry TJC as part of its linear bundle. *Id.* ¶ 38.

- Nor can Compass show justifiable reliance for the reasons discussed above.

*Finally*, Compass has not asserted compensable damages. *See Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1374 (N.Y. 1996). The alleged damages—such as losing a "unique opportunity to lobby the FCC to condition approval of the merger on the distribution of a Linear TJC," Compl. ¶ 163—depend upon a series of intervening events and a future "contractual bargain, the extent, and ... the very existence of which is completely undeterminable and speculative." *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1163 (N.Y. 2017).

**Defamation.** Compass's unrelated defamation claim should be dismissed as well. *First*, the claim is premised on a statement that is substantially true. The postcard at issue said: "As of 6/22/2018, The Jewish Channel ceased providing full video content to Spectrum." Compl. ¶ 124; Ex. C. According to the complaint, that is exactly what happened. As Compass concedes, it twice ceased providing video content to Charter due to a technical error not attributable to Charter. Compl. ¶¶ 118–21. The absence of a false statement precludes Compass's claim for defamation. *See, e.g., Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 245–47 (2d Cir. 2017).

*Second*, Compass fails to plead facts showing special damages or libel per se, as required to state a defamation claim. *See, e.g., Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010). Special damages "must be fully and accurately stated, with sufficient particularity to identify actual losses," which Compass did not do. *Id.* Nor has Compass made out a claim for libel per se. The only harm Compass identifies is that "Defendant's untrue statement implied and conveyed falsely that Plaintiff was shutting down and no longer providing content." Compl. ¶ 177. But nothing in the postcard reasonably implies that TJC—let alone Compass—was shutting down altogether. And even if it did, merely saying that part of a business is closing is not libel per se. *See, e.g., Kforce, Inc. v. Alden Pers., Inc.*, 288 F. Supp. 2d 513, 517 (S.D.N.Y. 2003).

*Finally*, the statement says nothing about Compass whatsoever and thus cannot satisfy the requirement that a defamatory statement be "of or concerning" the plaintiff. *See, e.g., Moccio v. Cornell Univ.*, 2009 WL 2176626, at *3–4 (S.D.N.Y. July 21, 2009).

Sincerely,

Judson Brown, P.C.

Exhibits

A.      12/22/2015 TJC Proposal

B.      12/24/2015 Email chain between Elliot Singer and Allan Singer

C.      08/15/2018 Spectrum Postcard

cc:      Judge Victor Marrero

4

# EXHIBIT A

| | |
|---|---|
| **From:** | Elie Singer |
| **To:** | Singer, Allan R |
| **Subject:** | Follow up and rate card |
| **Date:** | Tuesday, December 22, 2015 1:15:25 PM |
| **Attachments:** | TJCRateCardforCharter.docx |
| | ATT00001.txt |

Hi Allan,

As per our conversation yesterday, I'm sending a rate card we discussed that reflects the points we touched on during our call.

Thanks again for all the time you gave me on the phone yesterday.


Best regards,

Elie


Elie Singer
CEO
Compass Productions Intl
The Jewish Channel
(212) 643-9500

**The Jewish Channel**
**Programmer Proposal to Charter Communications**
**December 22, 2015**

## Contract Term

New agreement between Programmer and Charter Communications to begin February 1, 2016, and extend through January 31, 2021.

## Terms

Detailed terms to be defined in a contract between Programmer and Charter Communications.

Charter Communications will launch Programmer's programming service on all its systems, made available to all subscribers in the "Silver" tier, which will have approximately 8 million subscribers on the launch date, no later than 120 days after the closing of Charter's merger with Time Warner Cable.

Programmer will provide an HD service, as well as an additional SD option that may be provided to subscribers in addition to the the HD service.

Programmer will provide 2 minutes of local advertising availability per hour of programming.

## Rate Card

| Aggregate Service Subscribers in all Charter Communications Systems | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| 3,750,001 – 4,500,000 | $0.0775 | $0.0825 | $0.0875 | $0.0925 | $0.0975 | $0.1025 |
| 4,500,001 – 5,500,000 | $0.0725 | $0.0775 | $0.0825 | $0.0875 | $0.0925 | $0.0975 |
| 5,500,001 – 6,500,000 | $0.0675 | $0.0725 | $0.0775 | $0.0825 | $0.0875 | $0.0925 |
| 6,500,001 – 8,000,000 | $0.0600 | $0.0650 | $0.0700 | $0.0750 | $0.0800 | $0.0850 |
| 8,000,001+ | $0.0500 | $0.0525 | $0.0575 | $0.0625 | $0.0675 | $0.0725 |

## Rights for Authentication (TVE) and Video On Demand

Charter Communications will be entitled to the TVE and Video On Demand rights detailed in the forthcoming contract. Programmer will be offering a VOD service of no fewer than 10 hours per month.

# EXHIBIT B

| | |
|---|---|
| **From:** | Elie Singer |
| **To:** | Singer, Allan R |
| **Subject:** | Re: Follow up and rate card |
| **Date:** | Thursday, December 24, 2015 1:09:16 PM |

Allan,

Thank you for your response.

I really tried to draft the document to incorporate the main points of our conversation, and I thought I did. I can only think of two things you could be referring to.

One was the MFN, but I assumed that would be something you'd put in a contract rather than a rate card. As I said in our conversation, I'd have no issue with having one. I'd be happy to resend it with an MFN reference.

The second was the timing. I put it in at 120 because you said 60 and 90 days weren't possible.

If there's something else I've forgotten, please let me know what I've missed and I'll revise and resend.

Happy holidays.


Elie


Sent from my iPhone


Sent from my iPhone


Sent from my iPhone
> On Dec 23, 2015, at 8:36 PM, Singer, Allan R <Allan.Singer@charter.com> wrote:
>
> Elie, I received this and your voice mail message today. To clarify, I believe you understand it does not actually reflect all the points we discussed, but thank you very much nonetheless.
>
> Yours,
>
> Allan Singer
>
>> On Dec 22, 2015, at 11:15 AM, Elie Singer <esinger@compasstv.com> wrote:
>>
>> Hi Allan,
>>
>> As per our conversation yesterday, I'm sending a rate card we discussed that reflects the points we touched on during our call.
>>
>> Thanks again for all the time you gave me on the phone yesterday.
>>
>>
>> Best regards,

```
>>
>> Elie
>>
>>
>>
>> Elie Singer
>> CEO
>> Compass Productions Intl
>> The Jewish Channel
>> (212) 643-9500
>>
>> <TJCRateCardforCharter.docx>
>
```

# EXHIBIT C

 12405 Powerscourt Drive
St. Louis, MO 63131

PRSRT STD
U.S. POSTAGE
**PAID**
MADISON, WI
PERMIT NO. 785

# AN IMPORTANT UPDATE ABOUT YOUR
# SPECTRUM CHANNEL LINEUP

T1  P1 1 ***********************************SNGLP

**Spectrum**▶

Dear                     ,

As of 6/22/2018, The Jewish Channel ceased providing full video content to Spectrum. This channel's content will no longer be available, effective on or around 9/25/2018.

As a result, any monthly recurring charge for this channel will be removed from your account and a pro-rated credit for any charges that occurred after 6/22/2018 will be issued.

If you have any questions, call us at 1-855-757-7328.

Thank you for being a Spectrum customer.

Sincerely,

Kathleen Griffin
VP, Marketing Communications

©2018 Charter Communications
8/15/18  BGS 122211

# EXHIBIT 2

*Law Offices of Jonathan E. Neuman, Esq.*

*176-25 Union Tuanpike, Suite 230, Fresh Meadows, N.Y. 11366*

DOCUMENT
ELECTRONICALLY FILED January 11, 2019
DOC #: _____
DATE FILED: 1/15/19

Judson Brown, P.C.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

CHAMBERS OF
JUDGE MARRERO

JAN 15 2019

**Re: Compass Productions v. Charter Communications**
**1:18-cv-12296 (SDNY)**

Mr. Brown:

Contrary to your letter, and as explained below, the Complaint adequately states claims for all four causes of action. Moreover, your letter raises inappropriate factual disputes, and disregards that "[t]he task . . . on a motion to dismiss is to 'assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" In re MF Global Hldgs. Sec. Litig., 982 F. Supp. 2d 277, 303 (S.D.N.Y. 2013). Such efforts cannot defeat the Complaint. *See, e.g.*, Van Dongen v. CNinsure Inc., 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013) (refusing to credit "fact-based disputes" on motion to dismiss).

**Breach of Contract:** As an initial matter, I disagree with your contention that the Statute of Frauds (the "Statute") applies in this instance. As alleged in the Complaint, Defendant agreed that if Plaintiff ceased its efforts at communicating with the FCC, which communications would have adversely impacted Defendant's merger with Time Warner, Defendant would provide Plaintiff with a carriage deal containing specific essential terms. Plaintiff complied fully with its obligations by stopping its communication with the FCC. Defendant then breached its obligation to give Plaintiff the agreed carriage deal. There was no further performance required by either party; as such, performance by both parties was feasible, and contemplated, within one year.

Even assuming *arguendo* that the Statute is applicable, and looking at the carriage deal itself, the essential terms were reached and agreed to. At Defendant's request, Plaintiff sent it a standard rate card memorializing the essential terms of the agreed-upon deal. The fact that the parties intended that the terms would later be memorialized in a more formal document does not negate that an agreement was reached between the parties. *See* Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 574 (2d Cir. 1993). Defendant acknowledged the terms in writing, but stated that Plaintiff understood that those were not all of the points. Thus, rather than demonstrating a distinct *lack* of agreement, as you claim, the email response does just the opposite, and confirms that those were the agreed-upon terms. Plaintiff responded the next day, identifying the missing points, and stated "If there's something else I've forgotten, please let me know what I've missed and I'll revise and resend." Defendant failed to inform Plaintiff that there were any missing items. "[A] court of equity will not permit a statute made for the prevention of frauds to be used as an instrument of fraud." Club Chain of Manhattan, Ltd. v. Christopher & Seventh Gourmet, Ltd., 74 A.D.2d 277, 283 (1st Dep't 1980). Where silence "is inconsistent with honest dealings and misleads another, then the silence may be deemed to be an acquiescence." Id. Hence, contrary to your naked assertion: (i) the parties in fact memorialized all of the essential terms; (ii) a confirmation was sent by Plaintiff within five business days; and (iii) Defendant did not object to any of the terms confirmed by Plaintiff. Thus, it is clear that the

**Page 1 of 4**

Statute was satisfied on multiple grounds. *See* N.Y. Gen. Oblig. Law § 5-701(b)(3)(a), (b), (d).

Moreover, even if the Statute of Frauds had not been satisfied, Plaintiff's full performance of its obligations under the agreement, in withdrawing and ceasing its communications with the FCC, would nonetheless make the agreement enforceable. *See* Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1538 n.4 (2d Cir. 1997). Furthermore, as the Second Circuit stated, application of the Statute of Frauds is complex and usually fact-dependent, and discovery might uncover a document or an admission that would satisfy one or more statutory exceptions, and therefore cases should usually proceed to discovery. Id.

Your contention that the parties did not agree to all of the material terms of the carriage deal is inappropriate to consider on this motion and, in any event, is belied by the allegations of the Complaint that the parties *had* agreed upon the essential terms. *See, e.g.*, Compl. ¶¶ 80-89. With respect to your specific contentions, the Complaint clearly alleges that the parties agreed that the launch would take place within a few months after the merger. Compl. ¶ 86. The Complaint also makes clear that they agreed to a five-year term, which was confirmed via email. Compl. ¶89. As shown above, your further contention that the rate card was rejected by Singer is simply not supported by the actual email. Likewise, your contention that Singer gave any indications that there was no intent to be bound absent a written document is also not supported. The Complaint makes clear that the parties understood that they were in agreement, and Plaintiff even specifically asked Singer to confirm that they were agreed, which he did. Compl. ¶¶ 83-84. As shown above, that the parties intended the terms to be put into a more formal document, which could not take place until after the merger, does not negate that an agreement was reached.

Your privity argument also fails because TJC is not a separate legal entity. The programmer of the channel is Plaintiff Compass, the only entity involved in this case.

**Promissory Estoppel:** Your contention that there was never a clear promise once again ignores Plaintiff's allegations. That the promise's implementation required a condition precedent, which condition precedent in fact took place, also does not negate the clear promise. The events of the paragraphs to which you refer (¶¶67, 68) transpired *before* the agreement, as the Complaint makes crystal clear. Your further contentions that Singer was unclear and ambiguous during the call or that he rejected the rate card are again contradicted by the clear allegations of the Complaint. Singer's email made clear that he did not reject the rate card. Finally, the contention that Singer then ignored Plaintiff is simply not true, as there was no further attempt at communication before Singer was no longer employed by Defendant. Again, your inappropriate factual disputes and arguments simply aren't supported by the clear allegations of the Complaint.

As you concede, an unconscionable injury or serious injustice would support a promissory estoppel claim. The Complaint makes clear that this was more than just a lost opportunity. Defendant's breach had far-ranging consequences, which affected Plaintiff's entire viability. Plaintiff lost out on a rare opportunity to lobby the FCC, something for which there is ample precedent. It could be decades before another such opportunity with one of the largest cable operators in the U.S. arises. Moreover, as explained, the business model Plaintiff currently operates under is no longer sustainable; thus this is more than just a "lost opportunity," – it is Plaintiff's entire viability. Compl. ¶35. Furthermore, as explained, Defendant's breach had a

ripple effect on Plaintiff's ability to transition to a Linear Bundled channel with other providers. Plaintiff has lost out on exposure to millions of potential viewers, which affects advertisers, advertising rates, live events, etc. Defendant strung Plaintiff along until it got what it wanted – the approved merger, millions of new customers, and hundreds of millions of dollars in new annual profit – while Plaintiff waited and spiraled closer to the day it will have to shut down. Your characterization of a simple "lost opportunity" is nonsensical and disingenuous. Plaintiff suffered an unconscionable injury and serious injustice. *See, e.g.,* Compl. ¶¶140-43, 148-51. With regard to promissory estoppel, "[w]hether the circumstances are so egregious as to render it unconscionable to permit the defendant to invoke the Statute of Frauds are questions that should not be determined on the pleadings, but should await a full determination of the facts upon the trial." Castellotti v. Free, 165 A.D.3d 535, 536 (1st Dep't 2018).

**Fraud:** Your arguments regarding the fraud claim fare no better. The law is clear that where promissory statements are made with a preconceived and undisclosed intention to not perform, they constitute a misrepresentation of a material existing fact, which is considered collateral to the contract and support a separate fraud claim. *See, e.g.,* Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956 (1986); White v. Davidson, 150 A.D.3d 610, 611 (1st Dep't 2017). Defendant's actions, especially at the pleadings stage, clearly create a sufficient inference of an intent to defraud my client into believing that they had an agreement, which you now contest was ever agreed to. Moreover, you contest the existence of the agreement and the viability of the contract cause of action; furthermore, the cause of action seeks damages different than those contained within the contract cause of action. It can therefore survive separate and apart from the contract cause of action. Wild Bunch, SA v. Vendian Entm't, LLC, 256 F. Supp. 3d 497, 503 (S.D.N.Y. 2017). With respect to your damages argument, the damages are specified in the complaint, and are not speculative or undeterminable. Compl. ¶¶ 163-67. At a minimum, the cause of action could give rise to punitive damages and attorney's fees, which are not sought as part of the contract cause of action; accordingly, there are damages that would be available for this cause of action that are not part of the contract cause of action. Moreover, to maintain this cause of action, special damages need not be shown where a collateral fraud is shown. Wild Bunch, 256 F. Supp. 3d at 507 n.5.

**Defamation:** Again, your arguments take selections from the Complaint and assert them out of context. The Complaint specifically alleges that all of the content had been replaced. Compl. ¶121. Accordingly, Defendant's postcard was categorically false, not "substantially true" as you erroneously contend. Instead, as described, Defendant cancelled the contract in retaliation for the impending lawsuit. With regard to your claim that Plaintiff has not established damages, Plaintiff does not need to, as the Complaint alleges defamation *per se* since Defendant's false statement was meant to injure my client in its trade or business. The very case to which you cite demonstrates this. Where the false statement impugns the entire business, it is defamatory *per se. See* Kforce, Inc. v. Alden Pers., Inc., 288 F. Supp. 2d 513, 517-18 (S.D.N.Y. 2003). The smaller and less well-established the business, the more easily a court can assume *per se* damages. Id. Moreover, Plaintiff has alleged special damages, in the form of subscribers who have ceased to exist. Compl. ¶124. Finally, as above, your contention regarding the defamation being related to TJC and not Compass must be rejected; Compass is the legal entity.

For all the reasons above, this case is meritorious and should proceed to discovery.

**Page 3 of 4**

Very truly yours,

Jonathan E. Neuman, Esq.
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366
(347) 450-6710
(718) 228-3689 (fax)
jnesq@jenesqlaw.com

cc: Honorable Victor Marrero

The Clerk of Court is directed to enter into the public record
of this action the letter above submitted to the Court by

_plaintiff_.

SO ORDERED.

_1-15-19_
DATE        VICTOR MARRERO, U.S.D.J.

# EXHIBIT 3

| | |
|---|---|
| **From:** | Elie Singer |
| **To:** | Singer, Allan R |
| **Subject:** | Follow up and rate card |
| **Date:** | Tuesday, December 22, 2015 1:15:25 PM |
| **Attachments:** | TJCRateCardforCharter.docx |
| | ATT00001.txt |

Hi Allan,

As per our conversation yesterday, I'm sending a rate card we discussed that reflects the points we touched on during our call.

Thanks again for all the time you gave me on the phone yesterday.


Best regards,

Elie



Elie Singer
CEO
Compass Productions Intl
The Jewish Channel
(212) 643-9500

**The Jewish Channel**
**Programmer Proposal to Charter Communications**
**December 22, 2015**

## Contract Term

New agreement between Programmer and Charter Communications to begin February 1, 2016, and extend through January 31, 2021.

## Terms

Detailed terms to be defined in a contract between Programmer and Charter Communications.

Charter Communications will launch Programmer's programming service on all its systems, made available to all subscribers in the "Silver" tier, which will have approximately 8 million subscribers on the launch date, no later than 120 days after the closing of Charter's merger with Time Warner Cable.

Programmer will provide an HD service, as well as an additional SD option that may be provided to subscribers in addition to the the HD service.

Programmer will provide 2 minutes of local advertising availability per hour of programming.

## Rate Card

| Aggregate Service Subscribers in all Charter Communications Systems | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| 3,750,001 – 4,500,000 | $0.0775 | $0.0825 | $0.0875 | $0.0925 | $0.0975 | $0.1025 |
| 4,500,001 – 5,500,000 | $0.0725 | $0.0775 | $0.0825 | $0.0875 | $0.0925 | $0.0975 |
| 5,500,001 – 6,500,000 | $0.0675 | $0.0725 | $0.0775 | $0.0825 | $0.0875 | $0.0925 |
| 6,500,001 – 8,000,000 | $0.0600 | $0.0650 | $0.0700 | $0.0750 | $0.0800 | $0.0850 |
| 8,000,001+ | $0.0500 | $0.0525 | $0.0575 | $0.0625 | $0.0675 | $0.0725 |

## Rights for Authentication (TVE) and Video On Demand

Charter Communications will be entitled to the TVE and Video On Demand rights detailed in the forthcoming contract. Programmer will be offering a VOD service of no fewer than 10 hours per month.

# EXHIBIT 4

| From: | Elie Singer |
| --- | --- |
| To: | Singer, Allan R |
| Subject: | Re: Follow up and rate card |
| Date: | Thursday, December 24, 2015 1:09:16 PM |

Allan,

Thank you for your response.

I really tried to draft the document to incorporate the main points of our conversation, and I thought I did.  I can only think of two things you could be referring to.

One was the MFN, but I assumed that would be something you'd put in a contract rather than a rate card.  As I said in our conversation, I'd have no issue with having one.  I'd be happy to resend it with an MFN reference.

The second was the timing.  I put it in at 120 because you said 60 and 90 days weren't possible.

If there's something else I've forgotten, please let me know what I've missed and I'll revise and resend.

Happy holidays,


Elie


Sent from my iPhone


Sent from my iPhone


Sent from my iPhone
> On Dec 23, 2015, at 8:36 PM, Singer, Allan R <Allan.Singer@charter.com> wrote:
>
> Elie, I received this and your voice mail message today.  To clarify, I believe you understand it does not actually reflect all the points we discussed, but thank you very much nonetheless.
>
> Yours,
>
> Allan Singer
>
>> On Dec 22, 2015, at 11:15 AM, Elie Singer <esinger@compasstv.com> wrote:
>>
>> Hi Allan,
>>
>> As per our conversation yesterday, I'm sending a rate card we discussed that reflects the points we touched on during our call.
>>
>> Thanks again for all the time you gave me on the phone yesterday.
>>
>>
>> Best regards,

>>
>> Elie
>>
>>
>>
>> Elie Singer
>> CEO
>> Compass Productions Intl
>> The Jewish Channel
>> (212) 643-9500
>>
>> <TJCRateCardforCharter.docx>
>

# EXHIBIT 5

   12405 Powerscourt Drive
St. Louis, MO 63131

PRSRT STD
U.S. POSTAGE
**PAID**
MADISON, WI
PERMIT NO. 785

# AN IMPORTANT UPDATE ABOUT YOUR
# SPECTRUM CHANNEL LINEUP

T1  P1 1 *********************************SNGLP

**Spectrum▸**

Dear                    ,

As of 6/22/2018, The Jewish Channel ceased providing full video content to Spectrum. This channel's content will no longer be available, effective on or around 9/25/2018.

As a result, any monthly recurring charge for this channel will be removed from your account and a pro-rated credit for any charges that occurred after 6/22/2018 will be issued.

If you have any questions, call us at 1-855-757-7328.

Thank you for being a Spectrum customer.

Sincerely,

*Kathleen Griffin*

Kathleen Griffin
VP, Marketing Communications

©2018 Charter Communications
8/15/18  BGS 122211