UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
COMPASS PRODUCTIONS INTERNATIONAL LLC,

                        Plaintiff,

        - against -

CHARTER COMMUNICATIONS, INC.,

                        Defendant.
------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____ 8/8/19
DATE FILED: 8/8/19
```

18 Civ. 12296

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Compass Productions International LLC ("Compass") brought this lawsuit against Charter Communications, Inc. ("Charter") in New York State Supreme Court, New York County. (See "Complaint," Dkt. No. 1-1.) The Complaint alleges breach of contract (Count I), promissory estoppel (Count II), fraudulent inducement (Count III), and defamation (Count IV). (See id. ¶¶ 126-83.) On December 28, 2018, Charter removed the lawsuit to this district. (See Dkt. No. 1.) Now before the Court are the pre-motion letters submitted by Charter seeking a conference to discuss a contemplated motion to dismiss the Complaint. Compass responded to Charter's request and urged the Court to deny it. The Court now construes such letters as constituting a motion by Charter to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") (the "Charter Motion").

1

For the reasons set forth below, the Charter Motion is DENIED as to Counts I and II and GRANTED as to Counts III and IV.

## I.   BACKGROUND[1]

A.   FACTUAL BACKGROUND

Compass is a New York limited liability company that owns The Jewish Channel ("TJC"), a television channel "that provides Jewish programming catering toward the Jewish population within the United States." (Complaint ¶¶ 1, 17.) Most cable operators in the United States carry TJC. Since 2007, TJC has been a Subscription Video On Demand (SVOD) channel. To watch a given program on a SVOD channel, the viewer must select that specific program in a menu. In this respect, a SVOD channel differs from ordinary, "linear" television channels, which have a constant, round-the-clock stream of programming.

By 2012, Compass had come to deem the SVOD model financially unsustainable and began to seek to convert TJC to a linear channel. Compass found this process difficult, and was advised by leaders in the Jewish community to wait until a merger of two major cable operators -- on the theory that, at that point, Compass could lobby the Federal Communications

---

[1] Except as otherwise noted, the factual background below derives from the Complaint, and the facts there pleaded, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See infra Part II. Except where specifically quoted, no further citation will be made to the Complaint.

Commission ("FCC") to condition approval of the merger on the post-merger cable operator's carrying TJC as a linear channel. Compass understood this strategy to have worked for other television channels geared toward ethnic minority audiences.

In 2015, it was announced that Charter (a cable operator organized as a Delaware corporation) was seeking FCC approval to acquire Time Warner Cable ("TWC"), which at the time was the second largest cable operator in the United States. Compass then asked its political contacts to reach out to the FCC to suggest that the FCC condition approval of the Charter-TWC merger on the merged entity's carrying TJC as a linear channel. Eventually, Compass decided that the time was ripe for it to lobby the FCC directly.

Before Compass could meet with the FCC, however, a Charter government relations employee asked Compass not to go through with the FCC meeting, on the grounds that such direct contact could potentially delay the close-to-approved merger, costing Charter millions of dollars. Compass agreed to meet with Charter instead, and to communicate with the FCC only if Compass and Charter could not come to an agreement about carrying TJC as a linear channel. Charter and Compass met in November 2015, but Compass left with the sense that it ought

3

to meet with the FCC while there was still an opportunity to do so.

On or about December 21, 2015, a phone call occurred that is a focal point of this litigation (the "December 2015 Call"). During the December 2015 Call, Charter Senior Vice-President of Programming Allan Singer ("Singer") spoke with Compass CEO Eliezer "Elliot" Singer ("Elliot").[2] Singer stated that, post-merger, Charter could carry TJC as a linear channel with Silver Tier carriage (meaning that TJC would reach some eight million homes). Singer asked Elliot if that was acceptable, and Elliot said yes. Singer offered Compass an initial license fee of five cents per subscriber per month, to which Elliot agreed. Elliot asked Singer to confirm that they were agreed on Silver Tier carriage at an initial license fee of five cents per subscriber per month, and Singer replied that they were in agreement (the "Oral Agreement"). Singer noted that a formal contract would have to wait until after the merger's approval, but stated that the Oral Agreement represented an accord on all but non-essential specifics. Elliot requested a standard form contract to begin reviewing, but Singer told him that (1) he could or would not provide such a form until after the merger's approval, and (2) the

---

[2] The Court adopts the Complaint's short-forms for the two Singers.

deal was contingent on the successful completion of the merger.

Singer then requested that Elliot provide a "rate card" to memorialize their agreement. (Complaint ¶ 87.) The next day, Elliot sent a rate card (the "Rate Card") confirming the terms of the Oral Agreement. Specifically, the Rate Card stated that: "[Charter] would launch Plaintiff [Compass's] programming on all of its systems at the Silver Tier Level for five years no later than 120 days after the closing of the merger, with an initial license fee of $0.05 in 2016 . . . and standard increases every year thereafter." (Id. ¶ 89.) Singer then emailed Elliot to say that he did not believe the Rate Card fully reflected the December 2015 Call. Elliot responded with additional details about the Rate Card, and, significant to the claims Compass asserts in this litigation, wrote that: "I really tried to draft the document to incorporate the main points of our conversation . . . . If there's something else I've forgotten, please let me know what I've missed and I'll revise and resend." (Id. ¶ 92.) When Elliot did not receive any further communication from Singer, Elliot alleges he believed that he had adequately allayed Singer's concerns. Accordingly, Elliot proceeded to wait for the merger to close.

The Charter-TMC merger closed in May 2016. In the summer of 2016, Elliot tried to contact Singer, but learned that Singer was no longer the head of programming at Charter. In or about December 2016, Elliot met with a different Charter executive, Eric Goldberg ("Goldberg"), at Charter's headquarters in Connecticut. At the meeting, Goldberg denied the existence of any contract to launch TJC as a linear channel and stated that, at most, Charter might now consider launching TJC as a linear channel with no license fee at all.

For roughly a year after the December 2016 meeting with Goldberg, Compass negotiated with Charter in an attempt to resolve the issue.

In February 2018, Goldberg contacted Compass about an issue with TJC's content. Elliot learned that a third-party technical error had caused much of TJC's programming to be erased off of Charter's servers. Some time later, Goldberg again informed Compass of a similar content issue, and stated that Charter was now "providing notice that they were terminating carriage" of TJC -- despite Elliot's explaining to Goldberg that the content was missing due to a technical problem caused by a third party, and through no fault of Compass's. (Id. ¶ 121.)

6

In August 2018, certain "TJC subscribers"[3] received a postcard (the "Postcard") informing them that TJC "would no longer be available as of September 25, 2018," because "[a]s of 6/22/2018 The Jewish Channel ceased providing full video content to Spectrum."[4] (Id. ¶ 124.)

B.    PARTIES' ARGUMENTS

By letter dated January 4, 2019, Charter informed Compass of its intent to move to dismiss the Complaint for failure to state a claim. (See "January 4 Letter," Dkt. No. 14 at Ex. 1.)

As to breach of contract, Charter first argues that the statute of frauds bars the claim because an agreement that cannot be performed within one year must be set forth in a signed writing -- but the only writing identified in the Complaint is the Rate Card, which Singer did not sign. Second, Charter argues that the Complaint fails to allege contract formation, because (1) Singer and Elliot never agreed to a material term -- duration of the contract -- during their December 2015 Call, and (2) Singer signaled that he would be bound only by a written agreement. Third, Charter argues that

---

[3] The Court understands the Complaint's reference to "TJC subscribers" to refer only to TJC subscribers who are Charter cable customers. Although the Complaint alleges that TJC is carried on "most cable operators within the United States" (Complaint ¶ 18), it does not specify what fraction of TJC subscribers access TJC via cable provided by Charter.

[4] Although the Complaint does not define "Spectrum," the Court understands Spectrum to be a reference to Charter's cable service.

the Complaint fails to allege that Compass was in privity of contract with Charter, given that the alleged discussions related only to TJC, not Compass.

As to promissory estoppel, Charter first argues that it did not make a clear and unambiguous promise upon which Compass reasonably and foreseeably relied. Charter argues that Compass could not have reasonably relied on representations made during the December 2015 Call because the Rate Card designated itself as a "proposal" and Singer rejected it. Second, Charter argues that Compass has suffered no unconscionable injury or serious injustice. At most, Charter maintains, Compass alleges an ordinary monetary injury resulting from lost revenue and viewers.

As to fraudulent inducement, Charter first argues that false statements indicating an intent to perform under a contract are insufficient to support a fraud claim. Second, Charter argues that Compass fails to allege the elements of fraud with sufficient particularity. Third, Charter argues that Compass's alleged damages are non-compensable because they depend on a series of intervening events.

As to defamation, Charter first argues that the claim fails because it is premised on statements in the Postcard which are substantially true, given that the Complaint concedes that Compass twice ceased providing video content to

8

Charter due to a technical error. Second, Charter argues that Compass fails to plead special damages or libel per se. Third, Charter argues that the Postcard cannot have defamed Compass, because the Postcard makes no reference to Compass itself.

By letter dated January 11, 2019, Compass notified Charter of its intention to oppose the contemplated motion to dismiss. (See Dkt. No. 12.)

As to breach of contract, Compass first argues that the statute of frauds is no obstacle, because the performance contemplated by the Oral Agreement -- launching TJC as a linear channel -- could be performed within a year. Second, Compass argues that, even if the statute of frauds applies, the Rate Card suffices as a written contract because it memorialized the essential terms of the Oral Agreement. Third, Compass argues that even if the statute of frauds is not satisfied, Compass's full performance makes the contract enforceable. Fourth, Compass argues that Charter's privity argument fails because TJC is not a legal entity separate from Compass.

As to promissory estoppel, Compass argues that it adequately pleads the required elements, and the Complaint belies Charter's contention that Singer (1) insisted he would be bound only by a written contract and (2) rejected the Rate Card. Compass also argues that its alleged injury is

9

sufficiently serious, because Charter's broken promise affected Compass's viability.

As to fraudulent inducement, Compass first argues that where promissory statements are made with a preconceived and undisclosed intention not to perform, they constitute a misrepresentation of a material existing fact collateral to the contract that supports a fraud claim. Second, Compass argues that its fraud claim is non-duplicative, because it seeks remedies -- punitive damages and attorneys' fees -- that are unavailable in the context of its contract claim.

As to defamation, Compass first argues that it adequately alleges defamation per se because Charter's allegedly false statement impugned Compass's entire business and was meant to injure Compass in its trade or business. Second, Compass argues that it has alleged special damages, in the form of subscribers who have ceased to exist. Third, Compass argues that the Postcard's reference to TJC did defame Compass, given that TJC is not a separate legal entity.

By letter dated January 25, 2019, Charter informed the Court that the pre-motion letter exchange required by the Court's Individual Practices failed to resolve the parties' dispute and argued that a motion to dismiss remained warranted. (See "January 25 Letter," Dkt. No. 14.) The January 25 Letter reiterates and expands upon Charter's earlier

10

arguments as to why each of the Complaint's four counts fails to state a claim.

The Court now construes the January 4 Letter and the January 25 Letter as constituting a motion by Charter to dismiss the Complaint pursuant to Rule 12(b)(6).

## II. **LEGAL STANDARD**

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See id. However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In resolving a Rule 12(b)(6) motion, the Court's task is "to assess the legal feasibility of the complaint, not to

11

assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 573-74 (S.D.N.Y. 2005) (internal quotation marks omitted), aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., No. 05 Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006); accord In re MF Glob. Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 302 (S.D.N.Y. 2013). In this context, the Court must draw reasonable inferences and resolve any doubts in favor of the non-moving party. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). However, the requirement that a court accept the factual allegations in the claim as true does not extend to legal conclusions. See Iqbal, 556 U.S. at 678.

### III. **DISCUSSION**

A.   BREACH OF CONTRACT

The elements of a breach of contract claim[5] are: (1) the formation of a contract; (2) plaintiff's performance;

---

[5] Charter raises the question of choice of law, but argues that the Court need not conduct a choice-of-law inquiry. (See January 4 Letter at 1.) Compass does not address the topic.

This action is predicated upon diversity jurisdiction; therefore, the choice-of-law rules of the forum state -- here, New York -- control. See Liberty Synergistics Inc. v. Microflo Ltd., 718 F.3d 138, 151 (2d Cir. 2013). Under those rules, New York law applies to Compass's claims because neither party demonstrates a conflict with New York law. See Zervos v. Trump, 94 N.Y.S.3d 75, 88 (App. Div. 1st Dep't 2019) ("Absent a showing of a discernable difference in the laws of the two states, no choice of law analysis is necessary, and New York law is applicable." (citation omitted)); SNS Bank, N.V. v. Citibank, N.A., 777 N.Y.S.2d 62, 64 (App. Div. 1st Dep't 2004) ("[Without a] conflict between the laws of the

(3) defendant's breach; and (4) damage to plaintiff caused by the breach. See McCormick v. Favreau, 919 N.Y.S.2d 573, 577 (App. Div. 3d Dep't 2011). Charter focuses on the first element, denying that a contract was ever formed. The elements of contract formation are: (1) offer; (2) acceptance; (3) consideration; (4) mutual assent; and (5) mutual intent to be bound. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004). Charter's main argument against formation invokes the statute of frauds, a legal principle that requires a contract that cannot be performed within a year to be made in writing. See D&N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 453-55 (1984).

The Court notes that its analysis is complicated by inconsistency within the Complaint as to whether Compass views the Oral Agreement or the Rate Card as the putative contract between Compass and Charter. Count I states that Charter agreed to give Compass five years of Silver Tier distribution. (See Complaint ¶ 127.) This statement can be read to imply that Compass views the Rate Card as the contract because the five-year term appears in the Rate Card but not in Compass's recounting of the Oral Agreement. (See id. ¶¶ 81-87.) If the Rate Card -- which contemplates Charter's

---

competing jurisdictions . . . the law of the forum state where the action is being tried should apply." (citations omitted)).

performance over a period longer than a year -- in fact constitutes the parties' alleged contract, the statute of frauds becomes a potentially serious obstacle to Compass's claim.

However, the Court finds it unnecessary to conduct a full statute of frauds analysis because the Complaint can also be read to allege that the Oral Agreement embodies the contract at issue. (See, e.g., id. ¶ 87 (stating that the Rate Card was to "memorialize" the contract), ¶ 128 (stating that the Oral Agreement's terms were "confirmed" in writing).) By its alleged terms, the Oral Agreement gives no indication that Charter could not perform -- by complying with its commitments to launch and carry TJC as a linear channel -- within one year, rendering the statute of frauds inapplicable. See D&N Boening, 63 N.Y.2d at 454 ("The question is not what the probable, or expected, or actual performance of the contract was; but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year." (quoting Warner v. Texas & Pac. Ry. Co., 164 U.S. 418, 434 (1986)).

The Court also notes, however, that Elliot's inclusion of a five-year term of carriage in the Rate Card complicates Compass's breach of contract claim, even if premised on the Oral Agreement. For if the Rate Card was -- as Compass alleges

14

-- merely a memorialization of the terms orally agreed to on the December 2015 Call, the five-year term in the Rate Card suggests that Elliot and Singer did in fact agree to the five-year term as part of the Oral Agreement. However, Compass does not allege that the five-year term was agreed to on the December 2015 Call, and any dispute over whether the five-year provision was part of the Oral Agreement is a factual question not suited to resolution on a motion to dismiss. Hence, although the Court gives Compass the benefit of this factual ambiguity at this stage, Charter may renew a statute of frauds defense later in these proceedings and upon a fuller evidentiary record.

Turning to Charter's alternative arguments, the Court rejects Charter's contention that no contract formed because the Oral Agreement lacks an agreement on the duration of the contract.[6] (See January 4 Letter at 2.) Although contract formation does require evidence of true agreement between the parties with respect to all material terms, see Saul v. Cahan, 61 N.Y.S. 3d 265, 269 (App. Div. 2d Dep't 2017), Compass alleges that Singer stated that the Oral Agreement contained

---

[6] The Court notes that Charter's argument to this effect -- that "[d]uring the [December 2015 Call], Elliot and Singer never discussed -- let alone agreed upon -- the duration of the contract" (January 25 Letter at 4) -- conflicts with the notion that the Oral Agreement did in fact contain a five-year carriage provision and hence fails to satisfy the statute of frauds.

15

all essential terms. (See Complaint ¶ 84.) Charter does not identify authority, or otherwise argue persuasively, to the effect that, notwithstanding Singer's alleged stipulation to the contrary, duration of carriage was material to this contract.

Similarly, the Court is unpersuaded by Charter's argument that no contract formed because Singer made clear that he would be bound only by a written agreement. (See January 4 Letter at 2.) The Complaint alleges that Singer assented to the Oral Agreement and cautioned only that the Oral Agreement (1) was contingent on the merger's approval and (2) would be reduced to a writing after such approval. (See Complaint ¶ 84 ("Singer responded that they were in agreement, and that while a formal contract would have to wait until after the merger's approval . . . they were agreed on all but the non-essential specifics."), ¶ 85 (Singer said that, although he and Elliot "were in agreement" and had a "deal," the deal "would be done only if and when the merger closed," and a "standard contract form" would have to wait "until after the merger"), ¶ 87 (Singer asked for Rate Card "to memorialize the terms of their agreement").) The Complaint contains no clear statement by Singer that he would deem the Oral Agreement binding only when reduced to a

16

writing; to the contrary, it alleges that he twice stated that he and Elliot had reached an agreement.

Finally, Charter's conclusory statement that Compass fails to allege privity of contract with Charter is unavailing. (See January 25 Letter at 5.) Compass alleges that Singer, acting in his capacity as a Charter senior executive, contracted with Elliot, the CEO of Compass, to have Charter launch TJC, which Compass owns, as a linear channel in exchange for Compass's forbearance from lobbying the FCC. (See Complaint ¶¶ 17, 65.) The contract as alleged was between Compass and Charter.

Accordingly, the Court denies Charter's motion to dismiss Compass's breach of contract claim.

B.   PROMISSORY ESTOPPEL

The elements of a promissory estoppel claim are: (1) a clear and unambiguous promise by defendant; (2) upon which plaintiff reasonably relied; (3) to plaintiff's detriment. See Bunkoff Gen. Contractors, Inc. v. Dunham Elec., Inc., 753 N.Y.S.2d 156, 158 (App. Div. 3d Dep't 2002). The Court finds that Compass's allegations regarding the Oral Agreement, discussed previously supra Section III.A, also suffice to plead a clear and unambiguous promise by Singer that, in return for Compass's forbearance from lobbying the FCC and in

17

the event the merger were approved, Charter would launch and carry TJC as a linear channel.

The Court also finds that Compass adequately alleges reasonable reliance upon that promise. After all, Singer expressed his dissatisfaction with the Rate Card (evincing his amenability to communicate concerns to Elliot by email) but then never responded to Elliot's request, made in Elliot's email addressing Singer's concerns about the Rate Card, that Singer let him know whether any outstanding points of disagreement remained. (Compare Complaint ¶ 91 (quoting Singer's December 23, 2015 email to Elliot voicing dissatisfaction with the Rate Card), with id. ¶ 93 ("Singer did not respond [to Elliot's reply email addressing Singer's point of dissatisfaction], which Elliot interpreted as his having addressed Singer's concerns sufficiently . . . ."). This recitation of the facts sufficiently alleges that, because Elliot believed he had allayed Singer's concerns, he reasonably refrained from lobbying the FCC any further and instead waited for TJC to be launched as a linear channel post-merger.

Moreover, the Court finds that Compass adequately alleges that, by forbearing from lobbying the FCC, it relied upon Charter's promise to its detriment. Although lobbying the FCC might not necessarily have resulted in the FCC's

18

conditioning its approval of the merger on the post-merger cable operator's carrying TJC as a linear channel, the Court finds that Compass's forbearance from lobbying the FCC was a sufficiently detrimental loss of a valuable opportunity to support a promissory estoppel claim. Compass alleges that (1) the SVOD format had become "an unsustainable business model" (id. ¶ 35); (2) Compass cared greatly about tying TJC's conversion to a linear channel to a merger approval process because it had failed at multiple attempts to convert TJC through direct negotiation with cable operators (see id. ¶ 38); and (3) the next opportunity to lobby the FCC to condition approval of a merger on carriage of TJC as a linear channel may not arise for some years (see id. ¶ 150).

Because the Court does not find (at least at this stage) the contract claim barred by the statute of frauds, and hence will allow the promissory estoppel claim to proceed as an alternative to -- rather than in the absence of -- a breach of contract claim, such ordinary injury to the relying party suffices to state a claim. See Darby Trading Inc. v. Shell Int'l Trading & Shipping Co., 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008) (stricter "unconscionable injury" standard for promissory estoppel claim required only where breach of contract claim fails on formation grounds by application of the statute of frauds).

19

Accordingly, the Court denies Charter's motion to dismiss Compass's promissory estoppel claim.

## C.   FRAUDULENT INDUCEMENT

The elements of a fraudulent inducement claim are (1) a representation of material fact; (2) which was untrue; (3) which was known to be untrue or made with reckless disregard for the truth; (4) which was offered to deceive another or induce him to act; and (5) which that other party relied on to its injury. See Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 580 (2d Cir. 2005). The fraudulent statement upon which this claim relies is Charter's alleged promise that, "upon approval of the merger, [Charter] would launch TJC as a Linear Bundled channel on the Silver Tier at a starting license fee of $0.05 per subscriber per month." (See Complaint ¶ 155.) Yet this promised action is the very performance to which Charter allegedly committed itself under its contract with Compass, see supra Section III.A, and "false statements indicating an intent to perform under a contract are insufficient to support a claim of fraud." PetEdge, Inc. v. Garg, 234 F. Supp. 3d 477, 491 (S.D.N.Y. 2017).

Indeed, to prevail on a fraud claim related to a contract, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or

extraneous to the contract; or (iii) seek special damages
that are caused by the misrepresentation and unrecoverable as
contract damages." Bridgestone/Firestone, Inc. v. Recovery
Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (citations
omitted). The Court finds that Compass fails to satisfy any
of these three alternatives. The Complaint alleges no legal
duty apart from the promise to perform, and
"misrepresentations of a future intent to perform under a
contract are neither collateral nor extraneous to the
contract." PetEdge, 234 F. Supp. 3d at 492. Further, Compass
does not allege damages for losses other than those connected
to TJC's failure to launch as a linear channel -- that is,
connected to Charter's alleged breach of contract. See
Complaint ¶¶ 167-173. Finally, although Compass's fraudulent
inducement claim seeks punitive damages, a mere request for
punitive damages does not suffice to render a fraud claim
non-duplicative of a contract claim by virtue of
differentiated damages. See Russell Pub. Grp., Ltd. v. Brown
Printing Co., No. 13 Civ 5193, 2014 WL 1329144, *3 (S.D.N.Y.
Apr. 3, 2014).

Accordingly, the Court grants Charter's motion to
dismiss Compass's fraudulent inducement claim.

D.    DEFAMATION

The elements of a defamation claim are (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability. See Celle v. Filipino Reporter Enterps. Inc, 209 F.3d 163, 176 (2d Cir. 2000) (citations omitted). The Court finds that Compass's claim founders on the first element, because the Postcard's allegedly defamatory statement -- that "As of 6/22/2018, The Jewish Channel ceased providing full video content to Spectrum" (Complaint ¶ 175; January 25 Letter at Ex. 5) -- does not mention or allude to Compass, the limited liability company that owns TJC. But "a publication defamatory of a place or product is not a libel against its owner unless the owner himself is accused of disreputable conduct." El Meson Espanol v. NYM Corp., 521 F.2d 737, 739 (2d Cir. 1975). The Court discerns no such accusation against Compass itself in the Postcard, the allegedly defamatory writing at issue here.

Accordingly, the Court grants Charter's motion to dismiss Compass's defamation claim.

22

## IV.   ORDER

For the reasons described above, it is hereby

**ORDERED** that the motion so deemed by the Court as filed by defendant Charter Communications, Inc. to dismiss (Dkt. No. 14) the complaint of plaintiff Compass Productions International LLC (Dkt. No. 1-1) is **DENIED** as to Counts I and II and **GRANTED** as to Counts III and IV, and it is further

**ORDERED** that the parties meet and confer and develop a proposed case management plan to be submitted to the Court within twenty days of the date of this Order.

**SO ORDERED.**

Dated:     New York, New York
           8 August 2019


                                        Victor Marrero
                                          U.S.D.J.

23