UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| COMPASS PRODUCTIONS INTERNATIONAL LLC, | 18-CV-12296 (VM) (BCM) |
| Plaintiff, | **MEMORANDUM AND ORDER** |
| -against- | |
| CHARTER COMMUNICATIONS, INC., | |
| Defendant. | |

**BARBARA MOSES, United States Magistrate Judge.**

Now before the Court is a challenge by plaintiff Compass Productions International LLC (Compass) to certain privileged redactions made by defendant Charter Communications, Inc. (Charter) in the course of document discovery. After reviewing the contested documents *in camera*, the Court upholds the claim of privilege.

## Background

Compass produces a cable television channel called The Jewish Channel (TJC). Beginning in 2007, TJC was carried as a "premium" channel in a "subscription video on demand" (SVOD) format by various cable operators, including Time Warner Cable (TWC). Compl. (Dkt. No. 1-1) ¶¶ 14, 17-25.[1] However, the SVOD model was cumbersome for the viewer and "economically impracticable" for the channel owner. *Id*. ¶¶ 27-34. Consequently, beginning in or around 2012, Compass sought to shift TJC to a linear bundled model, *id*. ¶¶ 35-36, and believed it had an opportunity to do so in 2015, when Charter made a bid to merge with TWC. *Id*. ¶¶ 47-51.

---

[1] Premium channels "require an additional monthly payment" to view, unlike "bundled" channels, which are "provided to all subscribers who make a basic payment required to obtain any cable television at all." Compl. ¶¶ 6-8. SVOD channels "only have their programming available in menus from which viewers must choose a specific program," unlike "linear" channels, which "have a 24/7 stream of programming that is always available to watch by turning to that channel's number." *Id*. ¶¶ 13-15.

Compass's original plan was to lobby the Federal Communications Commission (FCC), which was reviewing the planned merger, to urge that it require "Jewish Linear Bundled programming for channels such as TJC" as a "condition of the merger." Compl. ¶¶ 39-41, 51. At the request of Charter's government affairs department, however, Compass agreed to "speak about the issue privately" with Charter "before going to the FCC." *Id*. ¶¶ 60, 62. In December 2015, after a series of meetings, Charter's Senior Vice President of Programming, Allan Singer, allegedly made an oral promise to carry TJC as a linear bundled channel, with a license fee of five cents per subscriber per month, once the TWC merger closed. *Id*. ¶¶ 64-93.

The merger closed in May 2016, Compl. ¶ 94, but in December of that year, Charter – now acting through Eric Goldberg, whose title was Vice President of Content Acquisition and who reported to Charter's "newly tapped" Executive Vice President of Programming, Tom Montemagno – denied that any linear carriage deal had been made. *Id*. ¶¶ 97, 99, 107-13. By then, it was "too late to talk to the FCC as the merger had already been approved and had gone through." *Id*. ¶ 114. In late 2017, Compass prepared a draft complaint, which it forwarded to Charter, and "attempted to resolve the matter directly between counsel," to no avail. *Id*. ¶¶ 116-18. In 2018, after two episodes in which much of TJC's SVOD programming became unavailable to viewers,[2] Charter notified Compass that it was "terminating carriage" of TJC altogether. *Id*. ¶¶ 118-21. This action followed.[3]

---

[2] According to Compass, the glitch was due to "technical error" by third party Comcast Media Center (CMC), which caused "much of TJC's programming to be erased off of Defendant CHARTER'S servers." Compl. ¶ 118, 121.

[3] Compass filed its complaint in state court on November 13, 2018, asserting claims for breach of contract, promissory estoppel, fraudulent inducement, and defamation. (Dkt. No. 1.) Charter removed the case to this Court, on diversity grounds, on December 28, 2018. (*Id*.) On August 8, 2019, the District Judge dismissed plaintiff's claims for fraudulent inducement and defamation pursuant to Fed. R. Civ. P. 12(b)(6), leaving the contract and estoppel claims. (Dkt. No. 19.)

The parties now dispute the propriety of the privilege redactions made by Charter to a total of thirty emails or email chains that it produced in discovery. All of the redactions were originally logged, as a group, on a "categorical" privilege log served pursuant to Local Civil Rule 26.2(c). Compass first raised the issue in the parties' joint letter dated May 27, 2020 (Joint Ltr.) (Dkt. No. 55), arguing that some of the redactions "appear[ed] improper, and/or waived due to the forwarding of the emails for nonlegal purposes." Joint Ltr. at 4. In accordance with this Court's Order dated June 4, 2020 (June 4 Order) (Dkt. No. 57), plaintiff Compass identified five exemplar emails for closer consideration, whereupon Charter served a traditional (document-by-document) privilege log with respect to those documents, including all of the information required by Local Civil Rule 26.2(a)(2)(A). The parties then met and conferred but were unable to resolve their disputes concerning the propriety of the redactions. Consequently, on June 12, 2020, Charter submitted the unredacted documents to the Court by email, in accordance with the June 4 Order, for *in camera* review.[4] Having carefully reviewed the five disputed documents, the Court concludes that all of them were properly redacted on the basis of the attorney-client privilege.

## Standards

"State law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Thus, "[i]n diversity cases such as this, where state law governs the claims, the Court looks to state law for determining privilege." *Kleeberg v. Eber*, 2019 WL 2085412, at *6 (S.D.N.Y. May 13, 2019) (collecting cases). "The elements of the attorney-client privilege under New York law are the existence of an attorney-client relationship, a

---

[4] Defendant's counsel also submitted, by email, Charter's updated privilege log for the exemplar documents and the parties' correspondence, in which they disagreed as to whether the exemplars were properly redacted on privilege grounds but agreed that all five should be submitted to the Court for *in camera* review. Neither party submitted any *ex parte* argument to the Court.

communication made within the context of that relationship for the purpose of obtaining legal advice, and the intended and actual confidentiality of that communication." *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 264 (S.D.N.Y. 1995) (citing *People v. Osorio,* 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 614-15 (1989)); *see also* N.Y. C.P.L.R. § 4503(a)(1) (the attorney-client privilege protects "evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment").

The purpose of the attorney-client privilege is to "promot[e] full and frank communications between attorneys and their clients . . . thereby encourag[ing] observance of the law and aid[ing] in the administration of justice." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348 (1985); *see also Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) ("[t]he privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client"); *People v. Mitchell*, 58 N.Y.2d 368, 373, 448 N.E.2d 121, 123 (1983) ("Its purpose is to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidence will not later be revealed to the public to his detriment or his embarrassment."). However, "[b]ecause the privilege shields from disclosure pertinent information and therefore 'constitutes an "obstacle" to the truth-finding process,' it must be narrowly construed." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 624, 36 N.Y.S.3d 838, 842 (2016) (quoting *Matter of Jacqueline F.*, 47 N.Y.2d 215, 219, 417 N.Y.S.2d 884, 886 (1979)). Consequently, "[t]he party asserting the privilege bears the burden of establishing its entitlement to protection by showing that the communication at issue was between an attorney and a client for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship, that the communication is predominantly of a legal character, that the communication was confidential and

4

that the privilege was not waived." *Ambac*, 27 N.Y.3d at 624, 36 N.Y.S.3d 838, 842-43 (internal quotation marks omitted).

"The attorney-client privilege applies not only to individuals, but also to corporate entities," *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 519 (S.D.N.Y. 2001) (citing *Upjohn*, 449 U.S. at 391-92), and "protects from disclosure communications among corporate employees that reflect advice rendered by counsel to the corporation." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 442 (S.D.N.Y. 1995). "Therefore, although dissemination of privileged information to third parties generally waives attorney-client privilege, the distribution within a corporation of legal advice received from its counsel does not, by itself, vitiate the privilege." *Strougo*, 199 F.R.D. at 519-20; *see also Scott v. Chipotle Mexican Grill, Inc*., 94 F. Supp. 3d 585, 590 (S.D.N.Y. 2015) ("[T]he internal communication of corporate legal advice does not necessarily waive the privilege."). In order to preserve the privilege, disclosure within the corporate ranks must be limited to employees who are "in a position to act or rely on the legal advice contained in the communication," *Scott*, 94 F. Supp. 3d at 598; *accord Int'l Cards Co. v. Mastercard Int'l Inc*., 2014 WL 4357450, at *2 (S.D.N.Y. Aug. 27, 2014); *JA Apparel Corp. v. Abboud*, 2008 WL 111006, at *2 (S.D.N.Y. Jan. 10, 2008), or "who share[] responsibility for the subject matter underlying the consultation." *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 518 (D. Conn. 1976) (citation omitted), *appeal dismissed,* 534 F.2d 1031, 1032 (2d Cir. 1976); *accord Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc*., 2007 WL 1573913, at *4 (S.D.N.Y. May 24, 2007); *Verschoth v. Time Warner Inc.*, 2001 WL 286763, at *2 (S.D.N.Y. Mar. 22, 2001), *adhered to as amended,* 2001 WL 546630 (S.D.N.Y. May 22, 2001).

## **Application**

The first challenged exemplar, bearing Bates Number CHTCOMP-00004580, is an email chain dated February 28, 2018 – after Compass presented Charter with its draft complaint but before Charter terminated its SVOD carriage agreement. In the emails, Goldberg, Montemagno, and other Charter employees discussed Charter's discovery that "we no longer have any content available for The Jewish network [sic] SVOD service," due to "the provider [Compass] being behind on its payments" to CMC, which the emails describe as a third-party "aggregator." Although none of the emails in the chain was sent directly to or from a lawyer, the redacted portions – comprising three sentences, exchanged between Goldberg and Montemagno only – expressly discussed a planned communication between Montemagno and "the lawyers" for the purpose of obtaining legal advice concerning the missing content and Compass's contractual obligations in relation to that missing content. Those sentences were properly redacted. *See Ambac*, 27 N.Y.3d at 624, 36 N.Y.S.3d at 842-43.

The second challenged exemplar, bearing Bates Number CHTCOMP-00004584, is also dated February 28, 2020, and appears to constitute the communication that Goldberg and Montemagno discussed moments earlier: an email from Montemagno to three in-house Charter attorneys (General Counsel Richard Dykehouse, Associate General Counsel Larry Christopher, and Senior Vice President of Legal, Programming, Product & Regulatory Clifford Harris), alerting counsel to the issue of the missing TJC content and expressly asking for legal advice. The body of the email was therefore properly redacted as privileged. The fact that this email was cc'd to one non-lawyer Charter executive (Executive Vice President of Government Relations Catherine Bohigian) and forwarded to three more (Goldberg, Senior Vice President of Programming Acquisition Andrew Rosenberg, and Vice President of Programming Acquisition Mandy Orzo)

does not alter this conclusion. Goldberg was principally responsible for the relationship between Charter and Compass's SVOD channel, and therefore "share[d] responsibility for the subject matter underlying the consultation." *SCM Corp.,* 70 F.R.D. at 518. The other three all "worked with Charter's programming group" and according to Charter "needed to be aware of or participate in communications with Charter's legal department, given [Compass's] litigation threats," which were then pending. The Court has no reason to doubt this representation. Moreover, due to the nature of the questions that Montemagno asked counsel, it is clear that any Charter employee who interacted with Compass regarding TJC or participated in managing that relationship would be "in a position to act or rely on the legal advice [sought] in the communication." *Scott*, 94 F. Supp. 3d at 598. Copying or forwarding the privileged communication to these employees therefore did not constitute a waiver of the corporation's privilege.

The third challenged exemplar, bearing Bates Number CHTCOMP-00004818, is an email chain dated June 22, 2018, in which Montemagno and other Charter personnel, including counsel, discussed the issues raised by a notice from another cable operator, Optimum, that it would "discontinue" TJC's SVOD service "due to an inadequate amount of content being provided by the programmer." In the first email, sent at 1:57 p.m., Montemagno forwarded the Optimum notice to Charter's in-house counsel, with contextual comments – redacted by Charter – making it clear that the information was being provided so that counsel could consider it in connection with Compass's then-pending threat to file what ultimately became this action. Montemagno cc'd that email to Goldberg, Bohigian, and Rosenberg, all of whom were also involved in the February 28 communications. In the second redacted email, sent at 2:41 p.m., Goldberg supplied additional relevant information to in-house counsel, Montemagno, Bohigian, and Rosenberg. A final email forwarded both of the redacted communications (without further comment) to one additional non-

lawyer, Maria Mackeldy, who was Charter's Manager of Programming Implementation and Compliance and in that capacity needed to be aware of the guidance being provided by Charter's counsel concerning the Compass relationship.

I note, in this regard, that Charter had "approximately 98,000 active full-time equivalent employees" in 2018,[5] but limited its dissemination of the communications now at issue to a tiny handful, all of whom worked in or with the programming department, headed by Montemagno, who was clearly a decision-maker with regard to TJC's SVOD channel. On this record, the Court has no reason to conclude that any of the employees to whom the privileged communications were copied or forwarded was "*not* in a position to act or rely on the legal advice contained in the communication[s]." *Scott*, 94 F. Supp. 3d at 598 (emphasis added). *Cf. JA Apparel Corp.*, 2008 WL 111006, at *2 (disclosure to "a low-level employee to whom the legal advice . . . would have had no significance" may "constitute[] a waiver of the privilege").

The fourth challenged exemplar, bearing Bates Number CHTCOMP-00004820, is another email chain, also dated June 22, 2018, concerning the Optimum notice and its implications for the Charter-TJC relationship. Charter has redacted the body of a 2:08 p.m. email from Goldberg to in-house counsel, Montemagno, Bohigian, and Rosenberg, in which Goldberg furnished additional information concerning the effect of TJC's programming deficiency on Charter's subscribers. This communication is privileged because it is clear, in context, that the information was provided to counsel in connection with the threatened lawsuit from Compass. Later emails in the same chain forward the privileged communication to MacKeldey and Kyle Zack, Charter's Director of

---

[5] Charter Communications, Inc. Form 10-K (2018), available at https://ir.charter.com/static-files/58c225c7-915d-4b90-922e-18e22d94e11e (last visited June 23, 2020), at 17.

Programming Operations. For the same reasons discussed above, Charter did not thereby waive the attorney-client privilege as to Goldberg's communication with counsel.

The final challenged exemplar, bearing Bates Number CHTCOMP-00004846, is an email chain in which various Charter employees discuss TJC's SVOD service, including the lack of new programming and the effect of the Optimum notice. The entire chain was produced unredacted, with the exception of a single sentence in an email dated June 27, 2018 from Goldberg to Anderson and Jon Shaver, Charter's Senior Director for Video Products. That sentence expressly refers to a position taken by "the lawyers" that Goldberg "wanted [Anderson and Shaver] to see." Since the attorney-client privilege "protects from disclosure communications among corporate employees that reflect advice rendered by counsel to the corporation," *Bank Brussels Lambert*, 160 F.R.D. at 442, Charter permissibly redacted the sentence as privileged.

### Conclusion

For the reasons discussed above, Compass's challenge to Charter's privilege redactions fails. Compass's application for an order directing Charter "to unredact the emails," Joint Ltr. at 4, is DENIED.

Dated: New York, New York         **SO ORDERED**.
       June 24, 2020

_____
**BARBARA MOSES**
**United States Magistrate Judge**