UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------X

COMPASS PRODUCTIONS            :
INTERNATIONAL, LLC,            :
                              :
            Plaintiff,         :
                              :      18 Civ. 12296 (VM)
      - against -             :
                              :
CHARTER COMMUNICATIONS, INC.,  :      **DECISION AND ORDER**
                              :
            Defendant.         :

--------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Compass Productions International, LLC ("Compass") brought this lawsuit against Charter Communications, Inc. ("Charter") in New York State Supreme Court, New York County (see "Complaint," Dkt. No. 1-1), and Charter thereafter removed the action to this district on the basis of diversity jurisdiction. Compass's Complaint alleges breach of contract (Count I), promissory estoppel (Count II), fraudulent inducement (Count III), and defamation (Count IV). (See id. ¶¶ 126-83.) On August 8, 2019, the Court granted Charter's motion to dismiss Counts III and IV of the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Compass Prods. Int'l LLC v. Charter Commc'ns, Inc., No. 18 Civ. 12296, 2019 WL 4198586, at **7-9 (S.D.N.Y. Aug. 8, 2019). Now before the Court is Charter's motion for summary judgment on the remaining Counts pursuant to Rule

56(a) of the Federal Rules of Civil Procedure. (Dkt. Nos. 82–85.) For the reasons set forth below, Charter's motion for summary judgment is GRANTED.

## I.    BACKGROUND

A. FACTUAL BACKGROUND[1]

Charter is a multichannel video programmer distributor ("MVPD"). As an MVPD, Charter operates a cable service that allows programmers to provide channels of video content to Charter's customers through linear or subscription video-on-demand ("SVOD") services. Unlike linear services that make television programming constantly available on a dedicated channel, SVOD channels are typically available only to paying subscribers through a subscriber-initiated menu selection.

Compass owns television programming called The Jewish Channel ("TJC"), which Time Warner Cable ("TWC") carried as an SVOD channel. Charter has never carried TJC as an SVOD or linear channel.

On May 26, 2015, Charter made public its intent to merge with TWC. Upon hearing of this news, Compass's CEO, Elie Singer ("E.Singer"), called Charter's head of Programming,

---

[1] The factual recitation set forth below is confined to the facts in Charter's Local Rule 56.1 Statement (see "Def. SUMF," Dkt. No. 85) that Compass does not dispute. (See Dkt. No. 97.) Certain facts that the parties dispute (or purportedly dispute) are examined in Part III, infra. Unless specifically quoted or otherwise cited as necessary, no other citation to Charter's Local Rule 56.1 Statement will be made.

Allan Singer ("A.Singer") to request that Charter carry TJC
as a linear channel. A.Singer told E.Singer that Charter had
a lot going on at the time and suggested E.Singer call him
back during the following year.

In the meantime, Compass met with lobbyists to put
pressure on Charter. To further those efforts, E.Singer
engaged Howard Friedman ("Friedman"), former President and
Chairman of the American Israel Public Affairs Committee, who
contacted Congressman Steny Hoyer's office about talking to
the Federal Communications Commission (the "FCC"). While
Charter's merger with TWC was pending before the FCC for
approval, the FCC was engaged in a separate proceeding
evaluating the carriage of diverse and independent networks
across all MVPDs. Thus, Compass pressed for Charter's
carriage of TJC on the basis that if Charter did not carry
TJC, post-merger the Jewish communities currently served by
TWC would lack a Jewish network.

Congressman Hoyer's office put Friedman in touch with a
current lobbyist in the cable industry for advice on how to
proceed. This lobbyist told Friedman that before approaching
the FCC, Friedman should speak with someone from Charter. The
lobbyist connected Friedman to Waldo McMillan ("McMillan"),
Charter's Head of Government Affairs. During one of
Friedman's conversations with McMillan, McMillan asked

Compass "not to go to the FCC because that would mess up the merger," and instead McMillan would put E.Singer in touch with a senior executive at Charter. (Def. SUMF ¶ 38.)

Following through on his promise, McMillan arranged for E.Singer to speak to A.Singer again. On the morning of December 21, 2015, E.Singer called A.Singer and had an unrecorded conversation with no one else on the line (the "December 21 Call"). A.Singer understood Compass was seeking an agreement from Charter to carry TJC as a linear channel, and A.Singer asked E.Singer to describe the terms for such a deal. The parties dispute which terms were discussed, but they agree E.Singer asked A.Singer for a written contact and A.Singer told E.Singer that he could not send one because he did not know whether the merger would go through.

After the December 21 Call, E.Singer recounted the conversation to Steven Weiss, a Compass executive, and Friedman. According to Weiss, E.Singer stated that he and A.Singer agreed to a contract for "five years" of linear carriage of TJC. Weiss recounts that E.Singer told him the launch timing "was something that had been left entirely unclear," but "[Charter] wouldn't accelerate [launch] to 60 to 90 days." (Id. ¶ 62.) Nevertheless, "[E.Singer] believed [Compass] could still get 120 days possibly, but in any case, six to nine months after the merger." (Id.) Friedman similarly

recalls that "one thing [E.Singer] was still waiting for was an agreement on the launch date." (Id. ¶ 63.)

On December 22, 2015, E.Singer emailed A.Singer a document titled "The Jewish Channel Programmer Proposal to Charter Communications" (the "Proposal"). The Proposal listed a contract term of five years and included the following statements: "Detailed terms to be defined in a contract between Programmer and Charter Communications;" "Charter Communications will launch Programmer's programming service on all its systems, made available to all subscribers in the 'Silver' tier, which will have approximately 8 million subscribers on the launch date;" and Charter would launch TJC "no later than 120 days after the closing of Charter's merger with Time Warner Cable." (Id. ¶¶ 77-80.) The Proposal also included a section heading titled "Rate Card" with a chart underneath listing penetration rates, which are specific rates dependent on the number of subscribers. The parties agree E.Singer and A.Singer never discussed penetration-based rates during the December 21 Call.

A.Singer forwarded the Proposal and Rate Card to other Charter employees. In his cover email, A.Singer wrote, the "[p]roposed agreement is not conditioned on close, assumes obligations we cannot accept unless the transaction is approved and closes . . . I told [E.Singer] 120 days to launch

would not [be] realistic post-close, asked for a year post-close to do this but suggested perhaps say commercially reasonably efforts when [Charter] rebrand[s], no later than 6 months, ([E.Singer] did not like either apparently)." (Id. ¶¶ 99-100.)

On December 23, 2015, A.Singer responded to E.Singer's email. A.Singer told E.Singer "[t]o clarify, I believe you understand it does not actually reflect all the points we discussed, but thank you very much nonetheless." (Id. ¶ 91.) E.Singer responded on December 24, writing, "I really tried to draft the document to incorporate the main points of our conversation, and I thought I did." (Id. ¶ 92.) E.Singer stated that A.Singer could be referring only to the lack of a most favored nation clause and timing for the launch of TJC. E.Singer believed he had already addressed the launch timing by proposing 120 days since A.Singer said 60 and 90 days were not possible. A.Singer never responded to E.Singer's December 24, 2015 email.

E.Singer later testified that as to the launch timing term, "I remember specifically . . . [A.Singer] telling us that 30 days would not be possible and 60 days would not be possible and 90 days would be unlikely" and he "impl[ied] that it would be a very busy time for them the first few months . . . [after the merger closed] . . . which is why I

put the term 120 days in there." ("E.Singer Depo.," Dkt. No. 97-2 at 32:11-25.) When pressed whether E.Singer and A.Singer ever explicitly discussed the term of 120 days on the December 21 Call, E.Singer testified "I don't recall specifically whether we talked about 120 days." (Id. at 34:4-8.)

Following the December 2015 correspondence and A.Singer's lack of response, Compass continued its lobbying efforts by meeting with Congressional staff. On January 12, 2016, E.Singer emailed Friedman and stated:

> I just wish we could turn up the volume on Charter again. I feel like we're so close to getting a commitment from them. We've gotten agreement from them on the two most important terms — 8 million homes and $0.05 a month. They didn't commit to a launch date, so I don't know if that means they've committed. I'm afraid they need to commit to someone like a political office that they'll get this done before I'll say it makes sense to trust them.

(Def. SUMF ¶ 110.) Friedman and E.Singer then exchanged a series of emails acknowledging Charter's lack of commitment. (Id. ¶¶ 113-15.)

On March 18, 2016, E.Singer emailed A.Singer and asked for a phone call so that he could catch him up on some developments. A.Singer did not respond, nor did he speak or write to E.Singer after the December 2015 correspondence.

On May 10, 2016, the FCC issued an order approving Charter's merger with TWC, and six days later the merger

7

closed. Charter began incorporating programming offered by TWC but decided not to carry TJC. Compass subsequently filed suit.

B. <u>MOTION TO DISMISS ORDER</u>

Charter moved previously to dismiss Compass's breach of contract and promissory estoppel claims. See <u>Compass Prods.</u>, 2019 WL 4198586, at *3. Charter's main argument against the breach-of-contract claim was that the parties never formed a valid contract. Charter invoked the statute of frauds, a legal principle that requires a contract that cannot be performed within a year to be made in writing. See <u>D&N Boening, Inc. v. Kirsch Beverages, Inc.</u>, 472 N.E.2d 992, 993-94 (1984).

On August 8, 2019, the Court denied the motion as to Counts I and II because of a factual ambiguity in the Complaint which, when read in favor of Compass, made the statute of frauds inapplicable. See <u>Compass Prods.</u>, 2019 WL 4198586, at **7-8. The Court found that if Compass viewed the putative contract to embody an agreement by Charter to launch and carry TJC, performance was possible within a year. On the other hand, if the putative contract embodied an agreement by Charter to give Compass five years of Silver Tier distribution, the statute of frauds posed a potential obstacle to Compass's breach of contract claim. The Court gave Compass the benefit of the factual ambiguity in the

Complaint and left the option open for Charter to renew the statute of frauds defense upon a fuller evidentiary record.

As to Compass's promissory estoppel claim, the Court found that Compass's allegations sufficed to establish a prima facie case of promissory estoppel. See Compass Prods., 2019 WL 4198586, at *8. The Complaint's allegations demonstrated a clear and unambiguous promise by A.Singer that, in return for Compass's forbearance from lobbying the FCC and in the event the merger were approved, Charter would launch and carry TJC as a linear channel. The Court further found that Compass adequately alleged reasonable reliance upon that promise and reasonably refrained from lobbying the FCC to Compass's detriment -- Compass potentially lost a valuable opportunity that may not arise again for some years since Compass withheld lobbying the FCC after previously failing at multiple attempts to convert TJC to a linear channel through direct negotiation with cable operators.

Having found Compass's allegations adequately pled claims for breach of contract and promissory estoppel at the motion to dismiss stage, the Court allowed those claims to proceed, and discovery ensued.

C. PARTIES' ARGUMENTS

At this stage, Charter argues that Compass's breach of contract claim fails for four independent reasons. See "Def.

9

Mem.," Dkt. No. 83 at 14-26.) First, the parties did not agree on all essential terms of a carriage deal. Second, the statute of frauds bars enforcement of the alleged oral agreement. Third, the parties clearly communicated their intent to be bound only by a written contract, which never came to fruition. And fourth, Compass has no evidence to substantiate its alleged damages.

As for Compass's promissory estoppel claim, Charter argues it fails as a matter of law because, among other things, there was no clear and unambiguous promise of carriage. (See Def. Mem. at 26-29.) Specifically, discovery has proven that Charter never made a promise to carry TJC in exchange for Compass refraining from lobbying the FCC. If any promise was made in exchange for Compass not going to the FCC, Charter avers, the promise was to arrange a call between A.Singer and E.Singer, and that call occurred on December 21, 2015.

Compass opposes the Motion and contends that its breach of contract claim should proceed to trial because the evidentiary record thus far shows disputed questions of material fact. (See "Pl. Opp.," Dkt. No. 92 at 9-23.) First, Compass argues that the parties agreed upon the three essential terms of a standard carriage agreement, including agreeing to a launch window of three to six months. Second,

Compass contends that the statute of frauds does not apply because its breach of contract claim is based on the agreement for Charter to launch and carry TJC as a linear channel, which could be performed within one year. Third, Compass claims that neither side conditioned its agreement on a formal written document, and fourth, Compass can demonstrate reasonably accurate expectation damages.

Compass additionally argues that its promissory estoppel claim should survive summary judgment because there are substantial questions of fact surrounding Charter's alleged promise to Compass during the December 21 Call. (See Pl. Opp. at 23-27.) Compass argues that even if A.Singer and E.Singer did not make explicit reference to the FCC during the Call, A.Singer agreed, on behalf of Charter, to carry TJC as long as Compass did not approach the FCC for fear those efforts could block the merger.

## II.   **LEGAL STANDARD**

In connection with a motion for summary judgment under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." Samuels v. Mockry, 77 F.3d 34, 35 (2d Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986)). The role of a court

in ruling on such a motion "is not to resolve disputed issues
of fact but to assess whether there are any factual issues to
be tried, while resolving ambiguities and drawing reasonable
inferences against the moving party." Knight v. U.S. Fire
Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the burden of proving that no
genuine issue of material fact exists or that, because of the
paucity of evidence presented by the nonmovant, no rational
jury could find in favor of the nonmoving party. See Gallo v.
Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24
(2d Cir. 1994). "[T]he mere existence of *some* alleged factual
dispute between the parties will not defeat an otherwise
properly supported motion for summary judgment; the
requirement is that there be no genuine issue of *material*
fact." Anderson, 477 U.S. at 247-48.

In determining whether the moving party is entitled to
judgment as a matter of law, the court must "resolve all
ambiguities and draw all justifiable factual inferences in
favor of the party against whom summary judgment is sought."
Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d
290, 309 (2d Cir. 2008). Though a party opposing summary
judgment may not "rely on mere conclusory allegations nor
speculation," D'Amico v. City of New York, 132 F.3d 145, 149
(2d Cir. 1998), summary judgment is improper if any evidence

in the record allows a reasonable inference to be drawn in favor of the opposing party. <u>See</u> <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

### III. <u>DISCUSSION</u>

Charter moves for summary judgment on the two remaining counts in this action -- breach of contract and promissory estoppel. For the reasons discussed below, both claims fail as a matter of law and summary judgment in favor of Charter is appropriate.

### A. <u>BREACH OF CONTRACT</u>

Compass's breach of contract claim fails because on the record before it, the Court finds that the parties did not agree on at least one essential term. To establish a breach of contract under New York law,[2] a plaintiff must prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. <u>See</u> <u>First Inv'rs Corp. v. Liberty Mut. Ins. Corp.</u>, 152 F.3d 162, 168 (2d Cir. 1998). Charter denies that a contract with Compass ever existed. (<u>See</u> Def. Mem. at 15-19.)

---

[2] As explained in the Court's prior decision on Charter's motion to dismiss, New York law applies to this action predicated upon diversity jurisdiction because neither party demonstrates a conflict with New York law. <u>See</u> <u>Compass Prods.</u>, 2019 WL 4198586, at *5 n.5 (citing <u>Zervos v. Trump</u>, 94 N.Y.S.3d 75, 88 (App. Div. 1st Dep't 2019); <u>SNS Bank, N.V. v. Citibank, N.A.</u>, 777 N.Y.S.2d 62, 64 (App. Div. 1st Dep't 2004)).

For a contract to exist, plaintiff must prove: (i) an offer; (ii) acceptance; (iii) consideration; (iv) mutual assent; and (v) mutual intent to be bound. See Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004). The fundamental basis of a valid enforceable contract is a meeting of the minds, and, if there is no meeting of the minds on all essential terms, there is no contract. See Schurr v. Austin Galleries of Ill., 719 F.2d 571, 576 (2d Cir. 1983).

Whether there has been a meeting of the minds on all essential terms is a question of fact that must be resolved by analyzing the totality of the circumstances. See United States v. Sforza, 326 F.3d 107, 116 (2d Cir. 2003); see also Bazak Int'l Corp. v. Tarrant Apparel Grp., 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005) ("To determine the presence of mutual assent, . . . [t]he totality of parties' acts, phrases and expressions must be considered, along with the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." (internal quotation marks and citations omitted)). If the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract. See Schurr, 719 F.2d at 576; see also Missigman v. USI Ne., Inc., 131 F. Supp. 2d 495, 506 (S.D.N.Y. 2001) ("If a contract is not reasonably settled in

its material terms, there can be no legally enforceable contract."); Express Indus. & Terminal Corp. v. New York Dep't of Transp., 715 N.E.2d 1050, 1050 (1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.").

The question for the Court is whether the parties had a "meeting of the minds" as to all essential terms of a carriage deal. The parties do not dispute that launch timing is an essential term of any binding carriage contract. (See Pl. Opp. at 5 ("As discussed by Compass' expert . . . in this industry, there are three essential terms . . . a description of the network's genre and content, the launch tier and date, and the license fee.")); (Def. SUMF ¶ 160 ("Charter's and Compass's industry experts agree that each of these three terms is necessary in a carriage agreement.")). What is in dispute is whether Compass and Charter ever agreed on a window of time to launch TJC as a linear channel.

Putting aside the question of whether a window of time, rather than a date certain,[3] is sufficient to establish launch

---

[3] E.Singer's testimony makes clear, and Compass does not contest, that E.Singer and A.Singer never agreed to a specific launch date. (See, e.g., E.Singer Depo. at 194:7-12, 222:6-10.) Rather, Compass contends that the parties agreed to a launch window, which is an acceptable custom within the industry. (See Pl. Opp. at 10.) The Court accepts Compass's position for purposes of this motion for summary judgment.

timing, the Court finds that the totality of circumstances demonstrates there was no meeting of the minds on any amount of time to launch TJC,[4] much less the three-to-six-month window Compass advances. Compass contends that on the December 21 Call, A.Singer and E.Singer agreed to launch TJC sometime between three and six months after the merger, which is purportedly evidenced by A.Singer's internal email, dated December 22, 2015. (See Pl. Opp. at 10 ("[T]his internal communication clearly shows that . . . the launch would take place no later than 6 months after Charter's rebrand.")); (Dkt. No. 97-19.) A.Singer recounts in this internal email that he told E.Singer "120 days to launch would not be realistic" and instead he suggested "no later than 6 months." (Dkt. No. 97-19.) Compass uses this statement as alleged proof that Charter agreed to launch TJC no later than six months after the merger.

However, Compass ignores a crucial parenthetical in A.Singer's email accompanying his sixth month suggestion -- "([E.Singer] did not like that either apparently)." (Id.) It comes as no surprise that Compass avoids drawing attention to this parenthetical in its opposition memorandum because this

---

[4] Although the Court's decision on Charter's motion to dismiss left open the possibility that the statute of frauds defense may pose an obstacle for Compass, see Compass Prods., 2019 WL 4198586, at *6, the Court finds that Compass's breach of contract claim is premised on an alleged agreement to launch TJC, which could be performed within a year.

statement undermines the conclusion that on the December 21 Call E.Singer and A.Singer ever agreed to a six-month deadline. Conceivably, A.Singer may have been willing to set the six-month deadline, but this email, on which Compass heavily relies, when examined in context and its full content suggests that "apparently" E.Singer was not then ready to agree to that material term. (Id.)

Compass's witness testimony corroborates the lack of an agreed upon three-to-six-month launch window. E.Singer recounted the December 21 Call to two people -- Friedman and Weiss -- neither of whom mentioned a launch window during their testimony and in fact, contradicted such a finding. Friedman testified that E.Singer continued his lobbying efforts after the December 21 Call because he feared that Compass "could push [the launch] up for six months to a year." (Dkt. No. 97-3, "Friedman Depo.," at 158:10-19.) If the parties had firmly agreed to a three-to-six month launch window for TJC, there is no reason E.Singer would fear Charter pushing the launch date to as much as one year post-merger.

Likewise, Weiss testified that E.Singer told him after the December 21 Call that the "details of the launch date which is to say was it 120 days, was it 150 days, 180 days, nine months, yeah, that was still open to negotiation." (Dkt. No. 97-6, "Weiss Depo.," at 61:3-6.) Nine months clearly does

not fall within a six-month window. Tellingly, neither E.Singer, Friedman, nor Weiss testified that the parties agreed to launch TJC within a specified window of time.

There also is no evidence that A.Singer agreed to three months as the start of the possible launch window. It is undisputed that A.Singer told E.Singer "30 days would not be possible and 60 days would not be possible and 90 days would be unlikely." (Dkt. No. 97-2 at 32:11-25); (see also Dkt. No. 84-35 ("I put it in at 120 because you said 60 and 90 days weren't possible.").) But, based on A.Singer's statement that 90 days wasn't "possible," one cannot reasonably infer from such rejection that he nonetheless had agreed to a time window starting long after 90 days. (Id.) There is simply no evidence to support Compass's position that E.Singer and A.Singer agreed that Charter would possibly launch TJC after three months post-merger.

In fact, the December 22, 2015 internal email from A.Singer that Compass relies on to establish the six-month launch window it claims contradicts the three-month threshold -- A.Singer writes that he told E.Singer on the December 21 Call that "120 days to launch would not be realistic." (Dkt. No. 97-19.) If A.Singer thought four months was not realistic, it is improbable that the parties would have agreed to a start of the launch window in three months.

Having reviewed the evidentiary record and having considered Compass's arguments, the Court finds that the totality of the circumstances weighs heavily in favor of a finding that Charter and Compass never agreed to the timing of a launch window, and that no rational jury could conclude otherwise. Because there was no meeting of the minds between Compass and Charter on this essential term, no contract between the parties materialized. See Schurr v. Austin Galleries of Ill., 719 F.2d 571, 576 (2d Cir. 1983) (applying New York law).

B. PROMISORRY ESTOPPEL

Under New York law, the elements of a promissory estoppel claim are: (1) a clear and unambiguous promise by defendant; (2) a reasonable and foreseeable reliance by the party asserting the estoppel by reason of his reliance; and (3) an injury sustained by the party asserting the estoppel by reason of the party's reliance. See Ripple's of Clearview, Inc. v. Le Havre Assoc., 452 N.Y.S.2d 447, 449 (App. Div. 2d Dep't 1982), appeal denied 57 N.Y.2d 609.

The premise of Compass's promissory estoppel claim is that Charter "made a clear and unambiguous promise to [Compass] that if Compass did not talk directly with the FCC about conditioning approval of the merger on linear carriage of TJC, then [Charter] would give [Compass] a Linear channel

at the Silver Tier." (Compl. ¶ 147.) Compass contends that it reasonably and foreseeably relied on this promise and did not engage in communication with the FCC, to its detriment.[5]

Unlike the procedure governing the motion to dismiss, for which the Court was bound to accept the allegations in Compass's complaint as true, the evidentiary record now before the Court shows no evidence to support Compass's allegations of a clear and unambiguous promise made by Charter to give TJC a linear channel, as Compass claims. Although McMillan, on behalf of Charter, asked Friedman for Compass to refrain from lobbying the FCC, he promised a call between Charter and Compass, not carriage, in return. (See Def. SUMF ¶38); (Friedman Depo. 88:24-89:10.) That call occurred on December 21 between E.Singer and A.Singer.

No clear and unambiguous promise by Charter for TJC carriage in exchange for Compass refraining from approaching the FCC was made during the December 21 Call either. Throughout his testimony, E.Singer gave contradictory and ambiguous answers regarding whether on that Call A.Singer

---

[5] The Court is not persuaded by Compass's latest argument that Charter's alleged promise to carry TJC post-merger can be separated from the premise of the promise that Compass would not approach the FCC. Beginning with the Complaint, and continuing through Compass's opposition memorandum Compass filed in connection with the instant summary judgment motion, Compass, to establish elements two and three of its promissory estoppel claim, has relied on the premise that it agreed to refrain from lobbying the FCC.

ever explicitly promised a carriage deal in exchange for Compass refraining from lobbying the FCC. For example, E.Singer testified that he "divined" from certain statements A.Singer made that "he really didn't want [Compass] going to the FCC." E.Singer Depo. at 55:11-20. He added:

> Well, it wasn't like he asked the question, and we answered the question in exchange for this, we will do that. It was understood by me the way he started the call . . . and then when he softened and he said, he started offering us a carriage deal, I understood it to mean, well obviously, if we are offering you this carriage deal, you can't go out and . . . keep getting in the way of our merger.

Id. 62:15-63:3. At most, this testimony shows that E.Singer presumed that A.Singer expected Compass to refrain from approaching the FCC. But subjective assumptions and self-serving expectations do not equate to clear and unambiguous promises bearing legal consequences with potential liabilities.

Considering this testimony, and the paucity of evidence presented by Compass to the contrary, the Court is not persuaded that a rational jury could find the existence of a clear and unambiguous promise made by Charter as Compass alleges. Absent such a promise, Compass's promissory estoppel claim fails as a matter of law. See Gallo, 22 F.3d at 1223–24.

### IV.   <u>ORDER</u>

Accordingly, for the reasons stated above, it is hereby **ORDERED** that the motion (Dkt. Nos. 82-85) of defendant Charter Communications, Inc. for summary judgment on Counts I and II of the complaint of plaintiff Compass Productions International, LLC (Dkt. No. 1-1) is **GRANTED.** The Clerk of the Court is directed to terminate all pending motions and close this case.

**SO ORDERED.**

Dated: New York, New York
      10 January 2022

_____
                                    Victor Marrero
                                       U.S.D.J.